# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | § | |
|---|---|---|
| INTELLIGENT AGENCY, LLC, | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 4:20-CV-0185-ALM |
| v. | § | |
| | § | |
| 7-ELEVEN, INC., | § | |
| *Defendant,* | § | |
| | § | |

## CLAIM CONSTRUCTION MEMORANDUM AND ORDER

Before the Court is Plaintiff Intelligent Agency, LLC's ("Plaintiff's" or "IA's") Claim Construction Opening Brief (Dkt. #50), Defendant 7-Eleven, Inc.'s and Defendant Neighborfavor, Inc.'s ("Defendants'") Responsive Claim Construction Brief (Dkt. #51), Plaintiff's Claim Construction Reply Brief (Dkt. #54), Defendants' Sur-reply Claim Construction Brief (Dkt. #58).[1] Also before the Court are the parties' April 23, 2021 Joint Claim Construction and Prehearing Statement (Dkt. #49) and the parties' July 21, 2021 Joint Claim Construction Chart (Dkt. #61). The Court held a claim construction hearing on January 14, 2022, to determine the proper construction of the disputed claim terms in U.S. Patent No. 9,286,610 ("the '610 Patent") and U.S. Patent No. 9,894,476 ("the '476 Patent") (collectively, "the Asserted Patents"). Shortly before the start of the January 14, 2022 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion.

The Court issues this Claim Construction Memorandum Opinion and Order and hereby incorporates-by-reference the claim construction hearing and transcript. For the following reasons,

---

[1] The claim construction proceedings in *Intelligent Agency, LLC v. Neighborfavor, Inc.*, Case No. 1:20-cv-00777 in the United States District Court for the Western District of Texas, Austin Division (the "W.D. Tex. Case") were coordinated with the claim construction proceedings in this case. Dkt. #46; *see also* W.D. Tex. Case, Dkt. # 47.

the Court provides the constructions set forth below.

## I.       BACKGROUND

The '610 Patent, titled "Method and Apparatus for a Principal/Agent Based Mobile Commerce," issued on March 15, 2016, and was filed on July 4, 2012. Plaintiff contends that the '610 Patent is generally directed to methods, apparatuses and computer software systems for effectuating commercial transactions between principals, agents and users through the use of software applications installed on mobile devices. Dkt. #50 at 8. The Abstract of the '651 Patent states:

> According to one embodiment of the present invention, a principal/agent method for mobile commerce is presented wherein mobile users receive indicia that agent equipment is in proximity wherein said indication is conditional to preferences and settings contained in a data structure determined, at least in part, by a principal.

Claim 1 of the '610 Patent is an illustrative claim and recites the following elements (disputed terms in italics):

> 1.*A machine implemented method for facilitating a prospective business transaction involving a principal, an agent, and a user comprising*:
> at least partially causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an *agent* digital identifier, meet a location based criterion, as determined by using at least one microprocessor, wherein said generation of indicia is regulated by at least:
> *an agent-user matching algorithm using predefined data selected from the group consisting of*: data indicating a proclivity of said user toward predetermined business transactions, data related to terms of said prospective business transaction, wherein said terms are controlled by said *principal*, data related to parameters associated to said prospective business transaction, wherein said parameters are controlled by said *principal*, data related to a brand that is associated with said *agent*, data related to preferences associated with said user, wherein said preferences are controlled by said user, data related to user generated keywords indicating an explicit interest toward a predefined product, data related to user generated keywords indicating an explicit interest toward a predefined service, data related to patterns associated with said user, data related to attributes associated with said user, data related to locations associated with said prospective business transaction, wherein said locations are controlled by said *principal, and combinations thereof*; and

> a *principal*-controlled participation condition associated with said *agent* digital identifier wherein said *principal*-controlled participation condition *selectably enables* said second mobile equipment, associated with said *agent* digital identifier, to participate to *said machine implemented method*.

The '476 Patent, titled "Method, System, and Apparatus for Location-based Machine-assisted Interactions," issued on February 13, 2018, and was filed on May 11, 2014. The '476 Patent generally relates "to a method, a system and an apparatus for facilitating social interactions and/or professional interactions and/or business transactions." '476 Patent at 1:13-16. The Abstract of the '476 Patent states:

> In accordance with one example embodiment of the present invention a method comprises at least partially enabling a set of functionalities and attributes associated to an area for facilitating business transactions, networking activities, or social interactions of users who are within, proximate, or associated, at least provisionally, with said area. In some implementations, the present invention provides functionalities apt to discover taxonomies of users in relation to locations. In some other implementations, the present invention provides functionalities apt to trace or follow up with users who have associated their identities, at least during a time window, with said area.

Claim 1 of the '476 Patent is an illustrative claim and recites the following elements (disputed term in italics):

> 1.A method comprising:
> facilitating discovery of indicia of a *session area* via a location aware mobile application;
> wherein:
> a) said *session area* is *anchored to at least one reference point*;
> b) said *session area* exhibits at least one first set of spatial boundaries associated with said at least one reference point;
> c) said *session area* is associated with at least one time-related parameter defining at least one functionality connected with said *session area*;
> d) said discovery of indicia of said *session area* is facilitated, at least in part, based on assessment of a distance data from said at least one reference point;
> facilitating association with said *session area* of at least one user among a first plurality of users based, at least in part, on a distance parameter from said at least one reference point;
> facilitating selectively enabling the activation of a second plurality of users by an *authority*, wherein said activation facilitates the association of said second plurality of users with said first plurality of users;

facilitating enabling at least one *interactive networking functionality* for said at least one user among said first plurality of users, wherein said at least one user among said first plurality of users selectively receives indicia of at least one user among said second plurality of users;

*facilitating determining which user among said second plurality of users has the strongest connection with said reference point* based, at least in part, on that user's location;

facilitating activating a timer associated with said one user among said second plurality of users such that if a task is not accomplished by said one user among said second plurality of users within the expiration of said timer, an association with said at least one user among said first plurality of users is inhibited, at least temporarily, and thus the *quality of interactions* between said first plurality of users and said second plurality of users is regulated;

facilitating providing guidance indicia to said one user among said second plurality of users to facilitate a meeting with said at least one user among said first plurality of users.

## II.      LEGAL PRINCIPLES

### A.  Claim Construction

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). To determine the meaning of the claims, courts start by considering the intrinsic evidence. *Id.* at 1313; *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *Phillips*, 415 F.3d at 1314; *C.R. Bard, Inc.*, 388 F.3d at 861. The general rule—subject to certain specific exceptions discussed *infra*—is that each claim term is construed according to its ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the patent. *Phillips*, 415 F.3d at 1312–13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003); *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014) (quotation marks omitted)

("There is a heavy presumption that claim terms carry their accustomed meaning in the relevant community at the relevant time.") *cert. granted, judgment vacated,* 135 S. Ct. 1846 (2015).

"The claim construction inquiry . . . begins and ends in all cases with the actual words of the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998). "[I]n all aspects of claim construction, 'the name of the game is the claim.'" *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298 (Fed. Cir. 2014) (quoting *In re Hiniker Co.*, 150 F.3d 1362, 1369 (Fed. Cir. 1998)) *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015). First, a term's context in the asserted claim can be instructive. *Phillips*, 415 F.3d at 1314. Other asserted or unasserted claims can also aid in determining the claim's meaning, because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id*. For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id*. at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id*. (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id*. (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id*.

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. But, "'[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.'" *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *see also Phillips*, 415 F.3d at 1323. "[I]t is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

The prosecution history is another tool to supply the proper context for claim construction because, like the specification, the prosecution history provides evidence of how the U.S. Patent and Trademark Office ("PTO") and the inventor understood the patent. *Phillips*, 415 F.3d at 1317. However, "because the prosecution history represents an ongoing negotiation between the PTO and the applicant, rather than the final product of that negotiation, it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* at 1318; *see also Athletic Alts., Inc. v. Prince Mfg.*, 73 F.3d 1573, 1580 (Fed. Cir. 1996) (ambiguous prosecution history may be "unhelpful as an interpretive resource").

Although extrinsic evidence can also be useful, it is "'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Phillips*, 415 F.3d at 1317 (quoting *C.R. Bard, Inc.*, 388 F.3d at 862). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might

use claim terms, but technical dictionaries and treatises may provide definitions that are too broad

or may not be indicative of how the term is used in the patent. *Id*. at 1318. Similarly, expert

testimony may aid a court in understanding the underlying technology and determining the

particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported

assertions as to a term's definition are not helpful to a court. *Id*. Extrinsic evidence is "less reliable

than the patent and its prosecution history in determining how to read claim terms." *Id*. The

Supreme Court has explained the role of extrinsic evidence in claim construction:

> In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period. *See, e.g., Seymour v. Osborne*, 11 Wall. 516, 546 (1871) (a patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning"). In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the "evidentiary underpinnings" of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal.

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 331–32 (2015).

## B.      Departing from the Ordinary Meaning of a Claim Term

There are "only two exceptions to [the] general rule" that claim terms are construed

according to their plain and ordinary meaning: "1) when a patentee sets out a definition and acts

as his own lexicographer, or 2) when the patentee disavows the full scope of the claim term either

in the specification or during prosecution."[2] *Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d

1362, 1365 (Fed. Cir. 2014) (quoting *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362,

1365 (Fed. Cir. 2012)); *see also GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309

---

[2] Some cases have characterized other principles of claim construction as "exceptions" to the general rule, such as the statutory requirement that a means-plus-function term is construed to cover the corresponding structure disclosed in the specification. *See, e.g., CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed. Cir. 2002).

(Fed. Cir. 2014) ("[T]he specification and prosecution history only compel departure from the plain meaning in two instances: lexicography and disavowal."). The standards for finding lexicography or disavowal are "exacting." *GE Lighting Sols.*, 750 F.3d at 1309.

To act as his own lexicographer, the patentee must "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *Id.* (quoting *Thorner*, 669 F.3d at 1365); *see also Renishaw*, 158 F.3d at 1249. The patentee's lexicography must appear "with reasonable clarity, deliberateness, and precision." *Renishaw*, 158 F.3d at 1249.

To disavow or disclaim the full scope of a claim term, the patentee's statements in the specification or prosecution history must amount to a "clear and unmistakable" surrender. *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1329 (Fed. Cir. 2009); *see also Thorner*, 669 F.3d at 1366 ("The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). "Where an applicant's statements are amenable to multiple reasonable interpretations, they cannot be deemed clear and unmistakable." *3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1326 (Fed. Cir. 2013).

### C.    Definiteness Under 35 U.S.C. § 112, ¶ 2 (pre-AIA) / § 112(b) (AIA)

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention. 35 U.S.C. § 112, ¶ 2. A claim, when viewed in light of the intrinsic evidence, must "inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014). If it does not, the claim fails § 112, ¶ 2 and is therefore invalid as indefinite. *Id.* at 901. Whether a claim is indefinite is determined from the perspective of one of ordinary skill in the art as of the time the application for the patent was filed. *Id.* at 911. As it is a challenge to the validity of a patent, the failure of any claim in suit to comply with § 112 must be shown by clear and convincing evidence. *BASF Corp. v. Johnson*

*Matthey Inc.,* 875 F.3d 1360, 1365 (Fed. Cir. 2017). "[I]ndefiniteness is a question of law and in effect part of claim construction." *ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 517 (Fed. Cir. 2012).

When a term of degree is used in a claim, "the court must determine whether the patent provides some standard for measuring that degree." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (quotation marks omitted). Likewise, when a subjective term is used in a claim, "a court must determine whether the patent's specification supplies some standard for measuring the scope of the [term]." *Ernie Ball, Inc. v. Earvana, LLC*, 502 F. App'x 971, 980 (Fed. Cir. 2013) (citations omitted). The standard "must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).

### D.    Means-Plus-Function Limitations

Where a claim limitation is expressed in "means plus function" language and does not recite definite structure in support of its function, the limitation is subject to 35 U.S.C. § 112, ¶ 6. *Braun Med., Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997). In relevant part, 35 U.S.C. § 112, ¶ 6 mandates that "such a claim limitation 'be construed to cover the corresponding structure . . . described in the specification and equivalents thereof.'" *Id.* (citing 35 U.S.C. § 112, ¶ 6). Accordingly, when faced with means-plus-function limitations, courts "must turn to the written description of the patent to find the structure that corresponds to the means recited in the [limitations]." *Id.*

Construing a means-plus-function limitation involves multiple steps. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001). Once a court has determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id.*

A "structure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Id.* Moreover, the focus of the "corresponding structure" inquiry is not merely whether a structure is capable of performing the recited function, but rather whether the corresponding structure is "clearly linked or associated with the [recited] function." *Id.*

## III.   THE PARTIES' STIPULATED TERMS

The parties agreed to the construction of the following terms or pharses in their Joint Claim Construction and Prehearing Statement.

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "an agent-user matching algorithm using predefined data selected from the group consisting of: data indicating a proclivity of said user toward predetermined business transactions, data related to terms of said prospective business transaction, wherein said terms are controlled by said principal, data related to parameters associated to said prospective business transaction, wherein said parameters are controlled by said principal, data related to a brand that is associated with said agent, data related to preferences associated with said user, wherein said preferences are controlled by said user, data related to user generated keywords indicating an explicit interest toward a predefined product, data related to user generated keywords indicating an explicit interest toward a predefined service, data related to patterns associated with said user, data related to attributes associated with said user, data related to locations associated with said prospective business transaction, wherein said locations are controlled by said principal, and combinations thereof;"<br><br>'610 Patent: Claims 1, 6, 8, 10, and 17 | This term includes a closed Markush group that is introduced by the phrase "the group consisting of." The predefined data used by the claimed agent-user matching algorithm can only be selected from one or more of the following: "data indicating a proclivity of said user toward predetermined business transactions," OR "data related to terms of said prospective business transaction, wherein said terms are controlled by said principal," OR "data related to parameters associated to said prospective business transaction, wherein said parameters are controlled by said principal," OR data related to a brand that is associated with said agent," OR "data related to preferences associated with said user, wherein said preferences are controlled by said user," OR "data related to user generated keywords indicating an explicit interest toward a predefined product," OR "data related to user generated keywords indicating an explicit interest toward a predefined service," OR "data related to patterns associated with said user," OR "data related to attributes associated with said user," OR "data related to locations associated with said prospective business transaction, wherein said locations are controlled by said principal," OR "combinations thereof." The scope of this claim term does not cover an agent-user matching algorithm that uses predefined data that is not listed above. |
| "an agent-user matching algorithm" | "an algorithm matching agents to users" |

| '610 Patent: Claims 1, 6, 8, 10, and 17 | |
|---|---|
| "a process for causing the generation of indicia that said prospective business transaction has reached at least a predefined milestone selected from the group consisting of: said prospective business transaction has been transacted, said business transaction has been preliminarily accepted by said user, an indication of the nearby presence of said agent has been delivered to said user, an indication of the nearby presence of said user has been delivered to said agent, and combinations thereof"<br><br>'610 Patent: Claim 15 | This term includes a closed Markush group that is introduced by the phrase "the group consisting of." The predefined milestone used by the claimed process term can only be selected from one or more of the following: "said prospective business transaction has been transacted," OR "said business transaction has been preliminarily accepted by said user," OR "an indication of the nearby presence of said agent has been delivered to said user," OR "an indication of the nearby presence of said user has been delivered to said agent," OR "combinations thereof." The scope of this claim term does not cover a process for causing the generation of indicia that said prospective business transaction has reached a predefined milestone that is not listed above. |
| "wherein said at least one interactive networking functionality is governed by parameters selected from the group consisting of: a time parameter regulating incoming requests for interaction according to a predetermined time threshold, a predetermined threshold data parameter of previously received requests for interaction regulating incoming requests for interaction, prioritization of requests of interactions according to a premium subscriptions data parameter, a time data parameter associated with permanence within said at least one first set of spatial boundaries, a time data parameter associated with usage of a mobile application, a recurrence data parameter of associations with said session area, a user data score parameter based on feedback from users, an activity threshold parameter, and combinations thereof."<br><br>'476 Patent: Claim 4 | This term includes a closed Markush group that is introduced by the phrase "the group consisting of." The parameters governing the claimed interactive networking functionality can only be selected from the following: "a time parameter regulating incoming requests for interaction according to a predetermined time threshold," OR "a predetermined threshold data parameter of previously received requests for interaction regulating incoming requests for interaction," OR "prioritization of requests of interactions according to a premium subscriptions data parameter," OR "a time data parameter associated with permanence within said at least one first set of spatial boundaries," OR "a time data parameter associated with usage of a mobile application," OR "a recurrence data parameter of associations with said session area, a user data score parameter based on feedback from users," OR "an activity threshold parameter," OR combinations thereof. The scope of this claim term does not cover an interactive networking functionality for at least one user among a first plurality of users that is governed by parameters not listed above. |
| "wherein said indicia are based on data selected from the group consisting of: analytics of spatial patterns of members of said first plurality of users, analytics of | This term includes a closed Markush group that is introduced by the phrase "the group consisting of. The data on which the claimed indicia are based can only be selected from one or more of the following: |

| | |
|---|---|
| temporal patterns of members of said first plurality of users, a real time indication of the position of said one user among said first plurality of users, a real time indication of the position of said one user among said second plurality of users, data with reference to a position pledge information pertaining to said one user among said second plurality of users, data with reference to a position pledge information pertaining to said one user among said first plurality of users, and combinations thereof;"<br><br>'476 Patent: Claim 6 | "analytics of spatial patterns of members of said first plurality of users," OR "analytics of temporal patterns of members of said first plurality of users," OR "a real time indication of the position of said one user among said first plurality of users," OR "a real time indication of the position of said one user among said second plurality of users," OR "data with reference to a position pledge information pertaining to said one user among said second plurality of users," OR "data with reference to a position pledge information pertaining to said one user among said first plurality of users," OR "combinations thereof. The scope of this claim term does not cover indicia pertaining to members of a first plurality of users or a second plurality of users that are based on data not listed above. |
| "wherein a rate of interaction of said at least one user among said second plurality of users with users among said first plurality of users affects at least a parameter related to said at least one user among said second plurality of users selected from the group consisting of: a reward level, a status level, discoverability, visibility, and combinations thereof."<br><br>'476 Patent: Claim 12 | This term includes a closed Markush group that is introduced by the phrase "the group consisting of." The parameter affected by the rate of interaction can only be selected from one or more of the following: "a reward level," OR "a status level," OR "discoverability," OR "visibility," OR combinations thereof." The scope of this claim term does not cover a system in which the claimed rate of interaction of at least one user among a second plurality of users with users among a first plurality of users is affected by a parameter related to at least one user among the second plurality of users that is not listed above. |

Dkt. #49-1 at 1-5. The parties further agreed to the construction of the following terms in their

P.R. 4-5(d) Joint Claim Construction Charts.

| Claim Term/Phrase | Agreed Construction |
|---|---|
| "principal-controlled participation condition"<br><br>'610 Patent: Claims 1, 6, 8, 10, 17, 20 | Plain and ordinary meaning. |
| "selectively enabling"<br><br>'476 Patent: Claims 1, 9 | Plain and ordinary meaning. |

Dkt. #61-1 at 4, 23. In view of the parties' agreement on the proper construction of the identified terms, the Court hereby **ADOPTS** the Parties' agreement that these terms do not require construction.

### IV.   CONSTRUCTION OF DISPUTED TERMS IN THE ASSERTED USWS PATENTS

The parties' dispute the meaning and scope of twenty-nine terms or phrases in the Asserted Patents.

### A.  Preambles [Term No. 1][3]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| **Claim 1:** "A machine implemented method for facilitating a prospective business transaction involving a principal, an agent, and a user comprising:" | Claim 1: Preamble is limiting. | Preamble of Claim 1 is limiting. |
| **Claim 6:** "Mobile equipment comprising:" | Claim 6: Preamble is not limiting. | Preamble of Claim 6 is limiting. |
| **Claim 8:** "Apparatus comprising" | Claim 8: Preamble is not limiting. | The preamble of Claim 8 is "Apparatus comprising" and is not limiting. |

---

[3] Terms herein are identified by the "Term" number assigned by the parties in the Joint Claim Construction Chart. Dkt. #61-1.

| | | |
|---|---|---|
| **Claim 10:**"A computer software system having a set of instructions stored in a nontransitory computer-readable medium for controlling at least one general purpose digital computer in performing desired functions that are necessary to give a machine implemented method for facilitating a prospective business transaction involving a principal, an agent, and a user, said set of instructions comprising instructions formed into a plurality of modules, said plurality of modules comprising:" | Claim 10: (Underlined portions are limiting) "A computer software system having a set of instructions stored in a non-transitory computer-readable medium for controlling at least one general purpose digital computer in performing desired functions that are necessary to execute a machine implemented method for facilitating a prospective business transaction involving a principal, an agent, and a user, said set of instructions comprising instructions formed into a plurality of modules, said plurality of modules comprising:" | The following underlined portions of the preamble of Claim 10 are limiting: "A computer software system having a set of instructions stored in a non-transitory computer-readable medium for controlling at least one general purpose digital computer in performing desired functions that are necessary to execute a machine implemented method for facilitating a prospective business transaction involving a principal, an agent, and a user, said set of instructions comprising instructions formed into a plurality of modules, said plurality of modules comprising:" |

### 1. Analysis

A preamble may be construed as limiting "if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002) (quoting *Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999)). "Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *Catalina Mktg.*, 289 F.3d at 808 (quoting *Rowe v. Dror*, 112 F.3d 473, 478 (Fed. Cir. 1997)). "'[W]hether to treat a preamble as a claim limitation is determined on the facts of each case in light of the claim as a whole and the invention described in the patent.'" *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006) (quoting *Storage Tech. Corp. v. Cisco Sys., Inc.*, 329 F.3d 823, 831 (Fed. Cir. 2003)).

The parties agree that the preamble of Claim 1 is limiting. The parties dispute whether the preambles of Claims 6, 8, and 10 are limiting. The parties also dispute where the preamble of

Claim 8 ends. [4]

Regarding Claim 6, the preamble recites a "mobile equipment" and is necessary to provide antecedent basis for "said mobile equipment" recited in the body of the claim. If the preamble was not limiting, there would be no antecedent basis for "said mobile equipment." Moreover, Claim 6 recites more than one mobile unit, and the preamble is necessary to distinguish between the two mobile units. Accordingly, the Court finds that the preamble of Claim 6 is limiting.

Regrading Claim 8, the parties dispute where the preamble of Claim 8 ends. Defendants assert that the preamble of Claim 8 includes all of the following language:

> 8. Apparatus *comprising* at least one processor; and at least one memory including computer program code; the at least one memory and the computer program code configured to, with the at least one processor, cause the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a predefined location based criterion in a machine implemented method to facilitate a prospective business transaction involving a principal, an agent, and a user, wherein said generation of indicia is regulated by at least:

'610 Patent at Claim 8 (emphasis added). Plaintiff argues that transition words (such as "comprising") "typically mark the end of the preamble, with what follows constituting the body of the claim." *SIMO Holdings Inc. v. Hong Kong uCloudlink Network Tech. Ltd.*, 983 F.3d 1367, 1375 (Fed. Cir. 2021). The Court agrees with Plaintiff and finds that the preamble of Claim 8 is "Apparatus comprising." The remaining language of Claim 8 recites physical components (*e.g.*, memory and processor), which by their placement after "comprising" means they are recited limitations of the claim. Defendants argue that this admission by Plaintiff makes the dispute moot. Notwithstanding, the Court finds that the preamble of Claim 8 is "Apparatus comprising" and is

---

[4] The parties' arguments for these disputes can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 14-15); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 7-8); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 7-8); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 4).

not limiting.

Regarding Claim 10, Plaintiff argues that the following underlined portions of the preamble are limiting:

> Claim 10: "<u>A computer software system having a set of instructions stored in a non-transitory computer-readable medium</u> for controlling at least one general purpose digital computer in performing desired functions that are necessary <u>to execute a machine implemented method for facilitating a prospective business transaction involving a principal, an agent, and a user, said set of instructions comprising instructions formed into a plurality of modules</u>, said plurality of modules comprising:"

'610 Patent at Claim 10 (underlined added). Plaintiff contends that the non-underlined portion of the preamble of Claim 10 is not limiting because it merely states a purpose or intended use for the invention, which is fully defined in the reminder of the claim. The Court agrees. "[A] preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention.'" *TomTom, Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015) (Even if a portion of a preamble is determined to be limiting, that "does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended purpose of the invention."). Defendants did not provide any rebuttal to this argument.

## 2.  Court's Construction

For the reasons set forth above, the preambles of Claim 1 and Claim 6 are limiting. The preamble of Claim 8 is "Apparatus comprising" and is not limiting. Regarding Claim 10, the following underlined portions of the preamble of Claim 10 are limiting: "<u>A computer software system having a set of instructions stored in a non-transitory computer-readable medium</u> for controlling at least one general purpose digital computer in performing desired functions that are necessary <u>to execute a machine implemented method for facilitating a prospective business</u>

transaction involving a principal, an agent, and a user, said set of instructions comprising instructions formed into a plurality of modules, said plurality of modules comprising:"

### B. "principal" [Term No. 2]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
| --- | --- | --- |
| "principal" | Plain and ordinary meaning. | "an entity that enables or disables agent IDs and allows or disallows the participation of those agent IDs" |

#### 1. Analysis

The term "principal" appears in Claims 1, 2, 6, 8, 10, and 17 of the '610 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the patentee defined the term "principal" during prosecution.[5]

The Court finds that the patentee explicitly defined the term "principal" during prosecution by arguing that it included a limitation not taught in the prior art. Specifically, the patentee argued the following, stating that it was in the context of the "present invention":

> Applicant has amended all independent claims to highlight the differences between *Peterson* and the present invention to read:
>
> > "a principal-controlled ~~threshold~~ condition associated with said agent digital identifier wherein said principal-controlled ~~threshold~~ condition selectably enables said second mobile equipment~~,~~ associated with said agent digital identifier~~,~~ to participate to said machine implemented method."
>
> Applicant respectfully disagrees with examiner's view that *Peterson* teaches a principal-controlled condition associated with an agent identifier. *Peterson's* agents are "software agents". Software agents are persistent, goal-oriented computer programs that react to their environment

---

[5] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 16); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 8-9); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 9-10); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 5).

and run without direct supervision to perform some function for an end user or another program. In the present invention, agents are people representing a principal whose proxies are agent IDs. A principal can, in certain implementations, enable or disable said agent IDs and allow or disallow the participation of those agent IDs in said "method for facilitating a prospective business transaction involving a principal, an agent, and a user. " This limitation is not taught or suggested anywhere in *Peterson*.

*Peterson* is neither relevant nor renders the present application obvious in view of *Tullis*.

The above-mentioned limitations are incorporated in every independent claim. Since the entire remaining dependant claims are dependent upon the independent claims, the rejection of these claims is now moot.

Dkt. #51-2 at 122-123 (highlight added). As indicated above, the patentee argued that the recited "agent" was not the prior art "software agent," and that the "principal" was capable of enabling or disabling an agent ID and capable of allowing or disallowing the participation of the agent IDs. In other words, unlike the prior art, the "principal" was capable of "direct supervision."

This is consistent with other intrinsic evidence. For example, the specification states that "[i]n the example of FIG. 2, Column 211 contains the status of the agents *as determined by the principal*. For example, agent JPR-123 has been turned to the status of 'inactive' *by the principal*, Watches International, *as the principal* may desire that agent JPR-123 be excluded by the roster of active agents." '610 Patent at 7:10–16 (emphasis added). Furthermore, Claim 1 recites that the "principal" may control the terms of the business transaction, the data related to parameters associated with the business transaction, the data related to locations, and the participation conditions. Accordingly, the Court construes "principal" to mean "an entity capable of enabling or disabling an agent digital identifier ("agent ID") and capable of allowing or disallowing the participation of the agent ID"

Plaintiff argues that the passage cited in Defendants' brief is not a clear disavowal of claim scope. According to Plaintiff, the comments about the "principal" were permissive, and they were expressly limited to "certain implementations." Plaintiff also argues that Defendants' construction

is inconsistent with the plain language of the claims. Plaintiff contends that the plain language of Claim 1 states that the "principal-controlled participation condition" is what "selectably enables said second mobile equipment, associated with said agent digital identifier, to participate to said machine implemented method."

The Court's construction accounts for Plaintiff's "permissive" argument by requiring "capabilities," and relies on the remaining claim language to indicate when it is no longer permissive. Indeed, the claim language recites that the participation condition is controlled by the "principal," which is consistent with the patentee's arguments in the prosecution history. *See, e.g.*, Claim 1 ("a *principal-controlled* participation condition associated with said agent digital identifier wherein said *principal-controlled* participation condition selectably enables said second mobile equipment, associated with said agent digital identifier, to participate to said machine implemented method.") (emphasis added). Thus, the claim language itself indicates that the recited "principal" must be capable of controlling the "participation condition." Finally, Plaintiff's arguments appear to be moot because it stated during the hearing that it agreed with the Court's construction, assuming the Court did not adopt the plain and ordinary meaning.

### 2.  Court's Construction

For the reasons set forth above, the Court construes the term **"principal"** to mean **"an entity capable of enabling or disabling an agent digital identifier ("agent ID") and capable of allowing or disallowing the participation of the agent ID".**

### C.  "agent" [Term No. 3]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "agent" | Plain and ordinary meaning. | "person or people representing a principal whose proxies are agent IDs" |

### 1.  Analysis

The term "agent" appears in Claims 1, 2, 4, 6, 8, 10, 15, 16, 17, and 20 of the '610 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the patentee defined the term "agent" during prosecution [6]

The Court finds that the patentee explicitly defined the term "agent" during prosecution. Specifically, the patentee argued the following, stating that it was in the context of the "present invention":

Applicant has amended all independent claims to highlight the differences between *Peterson* and the present invention to read:

"a principal-controlled ~~threshold~~ condition associated with said agent digital identifier wherein said principal-controlled ~~threshold~~ condition selectably enables said second mobile equipment, associated with said agent digital identifier, to participate to said machine implemented method."

Applicant respectfully disagrees with examiner's view that *Peterson* teaches a principal-controlled condition associated with an agent identifier. *Peterson's* agents are "software agents". Software agents are persistent, goal-oriented computer programs that react to their environment and run without direct supervision to perform some function for an end user or another program. In the present invention, agents are people representing a principal whose proxies are agent IDs. A principal can, in certain implementations, enable or disable said agent IDs and allow or disallow the participation of those agent IDs in said "method for facilitating a prospective business transaction involving a principal, an agent, and a user. " This limitation is not taught or suggested anywhere in *Peterson*.

*Peterson* is neither relevant nor renders the present application obvious in view of *Tullis*.

The above-mentioned limitations are incorporated in every independent claim. Since the entire remaining dependant claims are dependent upon the independent claims, the rejection of these claims is now moot.

---

[6] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 16-17); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 9-10); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 10-11); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 5).

Dkt. #51-2 at 122-123 (highlight added). As indicated above, the patentee argued that the recited "agent" was not the prior art "software agent," but instead was "people representing a principal whose proxies are agent IDs." Thus, the patentee distinguished an "agent" from a "software agent." The former being a person, and the latter being a computer program run without direct supervision.

This is consistent with other intrinsic evidence. For example, the specification states that "[a] wireless digital identifier (ID agent) may be sent via an Interface or Data Connection 142 (for example, WLAN) from Agent equipment 160 to User Equipment 165 wherein an application, stored in Memory 120, is running." '610 Patent at 3:55–58. Claim 1 also recites "an agent" and "a second mobile equipment, that is associated with an agent digital identifier." Accordingly, the Court construes "agent" to mean "person representing a principal whose proxy is the agent digital identifier ("agent ID")."

Plaintiff argues that Defendants want to limit that meaning by requiring the agent to have "proxies" in the form of "agent IDs." According to Plaintiff, that is inconsistent with the language of Claim 1 because the claim recites that the "second mobile equipment" is "associated with an agent digital identifier." Plaintiff further argues that the claim does not recite that "an agent" is associated with "an agent digital identifier." The Court disagrees. Claim 1 recites "an agent" and "a second mobile equipment, that is associated with an agent digital identifier." A logical reading of the claim indicates that the agent is associated with the agent digital identifier. In other words, the recited "agent" is a "person representing a principal whose proxy is the agent digital identifier ("agent ID")," which is associated with a second mobile phone.

Plaintiff also argues that the "agent" can be an entity and is not limited to a person. *See, e.g.*, *id.* at 6:2–7 ("Alternatively, a fourth entity, in addition to the principal, the agent and the user, namely a business entity running the principal-agent service and having access to Server 100

which is hosting the matching algorithm, can define the details of said algorithm and manage any possible conflicts and interferences."). Plaintiff's position is contradicted by the intrinsic evidence. As discussed above, in distinguishing the prior art the patentee explicitly defined "agent" to mean "people representing a principal whose proxies are agent IDs." Dkt. #51-2 at 123.

Furthermore, all of the disclosed embodiments describe agents or persons carrying around the mobile equipment. For example, the specification states that "[a]ccording to this embodiment, an Agent Equipment 160 carried by an agent, includes a Memory 115 wherein an application is stored and is running." '610 Patent at 3:14–16. Similarly, the specification states that "[i]n this embodiment, the Radio Range Area 170 of the WLAN radio carrier results in an area in which the agent carrying Agent Equipment 160 can engage a user." *Id.* at 3:27–30; *see also id.* at 4:52–57 ("In one scenario, Principal Equipment 110 may represent and be used by a business entity, a principal, who wants to display his latest product via a testimonial such as an enthusiastic previous client for example. Such client will act as an agent and will be carrying around Agent Equipment 160 and a product that principal wants to sell."), *id.* at 6:67–7:3 ("In another embodiment, the ID agent can be just associated with a particular agent carrying Agent Equipment 160 but the equipment may be interchangeable."). Accordingly, the intrinsic evidence indicates that the recited "agent" is a "person," and not an "entity."

## 2.  Court's Construction

For the reasons set forth above, the Court construes the term **"agent"** to mean **"person representing a principal whose proxy is the agent digital identifier ("agent ID")."**

### D.  "an agent-user matching algorithm" [Term No. 4]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "an agent-user matching algorithm using predefined data selected from the group of … and combinations thereof" | Not governed by Section 112(6). | Claims 1, 6, 8, 17 and 20: Indefinite<br>-Governed by Section 112(6). The function is "matching an agent with a user using predefined data selected from the group of … and combinations thereof."<br>-There is no corresponding structure. |
| "a process for regulating said causing the generation of indicia that said location based criterion is met via an agent-user matching algorithm, wherein said algorithm is using predefined data selected from the group consisting of … and combinations thereof" | Not governed by Section 112(6). | Claim 10: Indefinite.<br>-Governed by Section 112(6). The function is "regulating said causing the generation of indicia that said location based criterion is met via an agent-user matching algorithm, wherein said algorithm is using predefined data selected from the group consisting of … and combinations thereof."<br>-There is no corresponding structure. |

### 1. Analysis

The phrase "an agent-user matching algorithm using predefined data selected from the group of … and combinations thereof" appears in Claims 1, 6, 8, and 17 of the '610 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The phrase "a process for regulating said causing the generation of indicia that said location based criterion is met via an agent-user matching algorithm, wherein said algorithm is using predefined data selected from the group consisting of … and combinations thereof" appears in Claim 10 of the '610 Patent. The parties dispute whether the phrases are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6.[7]

### i.    Rebuttable Presumption

---

[7] The parties' arguments for these disputed phrases can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 17); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 10-13); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 11-13); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 5-6).

Title 35 U.S.C. § 112, ¶ 6 provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." It is well established that "the failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted). Moreover, "[w]hen a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1348 (citations and internal quotation marks omitted).

Here, there is a rebuttable presumption that § 112, ¶ 6 does not apply because the claims does not recite the word "means." Therefore, the analysis proceeds in two steps. First, the Court must determine whether the phrase is in means-plus-function form pursuant to 35 U.S.C. § 112, ¶ 6. *See Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094, 1097 (Fed. Cir. 2014). If the Court determines that the phrase recites a means-plus-function limitation, then the Court proceeds to the next step and attempts "to construe the disputed claim term by identifying the corresponding structure, material, or acts described in the specification to which the term will be limited." *Id.* (internal quotation marks and citation omitted).

### ii. The Claims are Not Subject to § 112, ¶ 6.

Defendants contend that the claim term invokes means-plus-function treatment because "algorithm" is a nonce word that reflects nothing about the structure or the actual steps performed by term itself. Defendants argue that an algorithm, by its nature, is non-structural. Defendants

further contend that the claims are silent on what "set of steps" are required in the claimed "algorithm," and that there is no structural component to the "algorithm" specified in the claims. Defendants also argue that the intrinsic record fails to disclose any corresponding structure for the claimed function. For the following reasons, the Court finds that the claims are not subject to § 112, ¶ 6.

As it relates to this term, the independent claims do not recite the word "means," and Defendants have not overcome the rebuttable presumption that § 112, ¶ 6 does not apply. The claims themselves describe how the algorithm operates within the claimed invention to achieve its objectives. For example, the independent claims recite "a principal," "an agent," and "a user." The claims state that the agent-user matching algorithm partially regulates the "generation of indicia" that "a first mobile equipment" and "a second mobile equipment" meet a "location based criteria." The claims further recite that the agent-user matching algorithm may use different types of predetermined data. In some instances, the predetermined data may be controlled by either the principal, the agent, or the user. The claims further indicate that the agent-user matching algorithm uses the predetermined data to match an agent and a user.

By reciting the objectives of the "agent-user matching algorithm," and how the algorithm operates within the context of the claimed invention, the claim language connotes sufficiently definite structure to one of skill in the art. *See, e.g., Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319-21 (Fed. Cir. 2004) (finding "circuit [for performing a function]" to be sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1295, 1301 (Fed. Cir. 2014) (finding "heuristic [for performing a function]" to be sufficiently definite structure because the patent described the operation and objectives of the heuristic); *Collaborative Agreements, LLC v. Adobe*

*Sys.*, No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809, at *11-*24 (N.D. Cal. Dec. 2, 2015) (determining "code segment [for performing a function]" to be sufficiently definite structure because the claim described the operation of the code segment); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504, at *31-*32 (N.D. Cal. Dec. 3, 2015) (determining "processor [for performing a function]" to be sufficiently definite structure because the claim described how the processor functions with the other claim components).

The Court further notes that the claims in this case are similar to the claim in *Agis Software Dev., LLC v. Huawei Device USA Inc.*, No. 2:17-CV-513-JRG, 2018 U.S. Dist. LEXIS 174041, at *9 (E.D. Tex. Oct. 10, 2018). In *Agis*, the claim included algorithms to be executed in a programmable environment, and the court found that they did not invoke Section 112(6) because they included structure. *Id.* at *46-55. Specifically, the claim recited "a device programmed to perform operations comprising" followed by steps of an algorithm, such as "joining a communications network," "participating in the group," "presenting . . . a georeferenced map," etc. *Id.* The court found that the claim was not governed by Section 112(6) because the algorithm supplied sufficient structure. *Id.*

It is true that when a limitation is a means-plus-function limitation, and the corresponding structure is software, there needs to be an algorithm for the software or else the means-plus-function limitation will be considered indefinite unless the function can be performed by a general purpose computer. *See Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (holding that the corresponding disclosure for a computer-implemented means-plus-function claim is an algorithm). But that authority is not on point because that definiteness analysis is triggered only where the limitation is a means-plus-function limitation.

Here, Defendants have conflated the steps in the § 112, ¶ 6 analysis, by simply assuming

that the limitation is a means-plus-function limitation. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-1299 (Fed. Cir. 2014) ("Requiring traditional physical structure in software limitations lacking the term means would result in all of these limitations being construed as means-plus-function limitations and subsequently being found indefinite."); *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) (holding that the district court erred by effectively treating "program" and "user interface code" as nonce words and concluding in turn that the claims recited means-plus-function limitations.).

Defendants also argue that this case is similar to *Kaavo v. Amazon* where the disclosure in the specification was entirely disconnected from the claims. See *Kaavo Inc. v. Amazon.com, Inc.*, No. 14-353-LPS-CJB, 2018 U.S. Dist. LEXIS 101100, at *8 (D. Del. June 18, 2018) (finding "needs analysis algorithm" indefinite because the specification failed to disclose "what specific algorithm could be used to determine the user defined provisioning information"). In *Kaavo*, the parties disputed whether the term was indefinite under 35 U.S.C.S. § 112 ¶ 2 for failing to inform those skilled in the art about the scope of the invention with reasonable certainty. *Id.* In contrast to *Kaavo*, the parties here do not dispute whether the term "an agent-user matching algorithm" is indefinite under 35 U.S.C.S. § 112 ¶ 2. Indeed, the parties agree that "an agent-user matching algorithm" is "an algorithm matching agents to users." Dkt. No. 49-1 at 3. In the context of the intrinsic record, the Court finds that Defendants have not shown that the term "an agent-user matching algorithm" should be subject to § 112 ¶ 6. Accordingly, the Court finds that the disputed terms are not means-plus-function terms governed by § 112 ¶ 6.

## 2. Court's Construction

For the reasons set forth above, the phrase **"an agent-user matching algorithm using predefined data selected from the group of … and combinations thereof"** and the phrase **"a**

**process for regulating said causing the generation of indicia that said location based criterion is met via an agent-user matching algorithm, wherein said algorithm is using predefined data selected from the group consisting of … and combinations thereof"** are not subject to § 112 ¶ 6, and are given their **plain and ordinary meaning**.

## E.  "selectably enables" [Term No. 6]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "selectably enables" | "permits the eligible agent to participate" | Indefinite. |

### 1.  Analysis

The term "selectably enables" appears in Claims 1, 6, 8, 10, and 17 of the '610 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "selectably enables" is indefinite.[8]

Defendants contend that the word "selectably" is neither a word in the English language nor a term coined by the inventor. Defendants argue that there is no evidence that the inventor used the term "selectably enables" idiosyncratically, because the term was not used in the specification and not explained during the prosecution of the '610 Patent. Defendants further argue that Plaintiff fails to explain what the term means. Defendants also contend that it would be improper to equate "selectably enables" to "selectively enabling," a term which the parties agree should be given its plain and ordinary meaning. Defendants further contend that interpreting "selectably" to mean "selectively" would rewrite the claims.

Plaintiff responds that its expert, Dr. Easttom, conducted a Google Patent search for patents that use the term "selectably enables" and found 134,046 matches. Plaintiff also argues that the

---

[8] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 18-19); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 13-15); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 13-14); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 7).

word "selectable" appears in dictionaries, and it is unclear why Defendants contend the use of the "ly" suffix allegedly renders the word unintelligible.



Dkt. #54-2 at 3 (highlight added). Although less than ideal, the Court disagrees that the term "selectably" is completely unintelligible, as Defendants contend. The Court agrees with Plaintiff that "selectably" relates to being selectable when considered in the context of the intrinsic evidence. The term is recited consistently in the claims, and relates to selecting and enabling the second mobile equipment based on the participation condition. Likewise, the specification states that the principal determines the status of the agent. For example, the specification states that "[i]n the example of FIG. 2, Column 211 contains the status of the agents as determined by the principal. For example, agent JPR-123 has been turned to the status of 'inactive' by the principal, Watches International, as the principal may desire that agent JPR-123 be excluded by the roster of active agents." '610 Patent at 7:10–14.

**Principal Agent Data Structure**
**200**

| | ID Agent | Principal | Status Princ. | Status Agent | Entry | Offer | Parameters | Location |
|---|---|---|---|---|---|---|---|---|
| | 209 | 210 | 211 | 212 | 213 | 214 | 215 | 216 |
| | | | | | | | 217 | |
| 230 | JPR-123<br><br><br>JPR-234 | Watches International (WI) | Inactive<br><br><br>Active | Active<br><br><br>Active | IP Address/ Web page | 25% off a WI wrist watch model Tango. | • Only military personnel.<br>• Valid only in Texas<br>• Distance between agent equipment and user equipment less than 1000 feet | Closest WI dealer to the place where match has occurred. (Server software may determine closest dealer that has the item available and provide location and routing to user). 221 |
| 240 | RJA-123<br>RJA-176<br>RJA-735 | Jeep dealer located at Lat. / Long. or address | Active<br>Active<br>Inactive | Inactive<br>Active<br>Active | IP Address/ Web page | 3000$ off Jeep Wrangler | • Offer valid 1-5-2012 to 3-5-2012<br>• Time 8am -5 Pm 218 | • Jeep dealer located at Lat. / Long. or address 222 |
| 250 | N453 | Law offices located at Lat. / Long. or address | Active | Active | IP Address/ Web page | Law Firm Services. Uncontested divorce. 50% off | • Offer received only by users located within geofenced area (4 Lat and Long points defining area) 219 | • Law offices located at Lat. / Long. or address |
| 260 | XYZ-6634 | Computer Store. GPS: Lat. / Long. or address | Active | Active | IP Address/ Web page | 30% off on all 2011 laptops D2011 | • At least 15 accepted purchases<br>• Max 30 accepted purchases 220 | • Computer Store; GPS: Lat. / Long. or address |

**FIG. 2**

*Id.* at Figure 2. Thus, the intrinsic evidence indicates that "selectably" means "by selection," and the term "selectably enables" means "enables by selection." Accordingly, Defendants failed to show by clear and convincing evidence that the term "selectably enables" is indefinite.

### 2.   Court's Construction

The Court finds that the term **"selectably enables"** is not indefinite, and construes the term to mean **"enables by selection."**

### F.   "an indicator configured to provide an indication" [Term No. 7]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "an indicator configured to provide an indication that said mobile equipment, associated with a user digital identifier, and a second mobile equipment, associated with an agent digital identifier, meet a location based criterion, wherein said location based criterion facilitates a prospective business transaction involving a principal, an agent, and a user and said indication is regulated by at least: . . . and combinations thereof" | Plain and ordinary meaning. Not governed by Section 112(6). Alternatively, if governed by Section 112(6), the function is "to provide an indication that said mobile equipment, associated with a user digital identifier, and a second mobile equipment, associated with an agent digital identifier, meet a location based criterion." The corresponding structure is processor controller 420 in Fig. 4, coupled with an I/O user interface 450. The command for the generation of the indication comes from Server 100. The indicator is Server 100, comprising a Controller 101 and a Memory 102 where an algorithm is stored to provide such functionalities via radio links 140 and 141 to User Equipment 160 and 165 that a location based criterion is met. Additional structure and functionality, including relevant algorithms, are referenced in connection with Figures 1 and 5 and the written descriptions thereof. Exemplary descriptions of the algorithm and manner of operation can be found at col. 3, lines 27-47; col. 5, lines 12-24; col.9, lines 43-49; col. 7, lines 50-67; col. 8, lines 10-35; col. 12, lines 38-67; col. 13, lines 17-25. | Indefinite. Governed by Section 112(6). The function is "providing an indication that said mobile equipment, associated with a user digital identifier, and a second mobile equipment, associated with an agent digital identifier, meet a location based criterion, wherein said location based criterion facilitates a prospective business transaction involving a principal, an agent, and a user and wherein the indication is regulated by an agent-user matching algorithm using predefined data selected from the group consisting of: data indicating a proclivity of said user toward predetermined business transactions, data related to terms of said prospective business transaction, wherein said terms are controlled by said principal, data related to parameters associated to said prospective business transaction, locations are controlled by said principal, and combinations thereof". There is no corresponding structure. |

### 1.  Analysis

The phrase "an indicator configured to provide an indication …" appears in Claim 6 of the

'610 Patent. The parties dispute whether the phrase is a means-plus-function term governed by 35

U.S.C. § 112, ¶ 6.[9]

---

[9]  The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 19-20); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 15-16); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 14-15); and Defendants'

Defendants contend that "indicator" is a generic, nonstructural term that merely refers to a function and does not connote any structure. According to Defendants, "indicator" as used in the claim refers to something that performs the function stated in the claim. Defendants argue that no structure is provided in the claim and the function is used to state an end result. Defendants further argue that there is no structure in the specification that is clearly linked to the recited function.

Claim 6 does not recite the word "means," and Defendants have not overcome the rebuttable presumption that § 112, ¶ 6 does not apply. [10] The context of the claim confirms the structural nature of the claimed "indicator." The claim specifies the objectives and operation of the "indicator" by stating that it operates in conjunction with "said mobile equipment" and "second mobile equipment" to "provide an indication" that they meet a "location based criterion." The claim additionally specifies how the "indicator" operates to provide the indication. Specifically, the claim states that "said indication is regulated by at least: an agent-user matching algorithm using predefined data selected form the group consisting of . . .; and a principal-controlled participation condition associated with said agent digital identifier . . . ."

By reciting the objectives of the "indicator," and how the indicator operates within the context of the claimed invention, the claim language connotes sufficiently definite structure to one of skill in the art. *See, e.g., Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319-21 (Fed. Cir. 2004) (finding "circuit [for performing a function]" to be sufficiently definite structure because the claim recited the "objectives and operations" of the circuit); *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1295, 1301 (Fed. Cir. 2014) (finding "heuristic [for performing a function]" to be sufficiently definite structure because the patent described the operation and objectives of

---

Sur-Reply Claim Construction Brief (Dkt. #58 at 7).
[10] Section "i. Rebuttable Presumption" in Section D includes a discussion of relevant case law regarding the rebuttable presumption.

the heuristic); *Collaborative Agreements, LLC v. Adobe Sys.*, No. 15-cv-03853-EMC, 2015 U.S. Dist. LEXIS 161809, at \*11-\*24 (N.D. Cal. Dec. 2, 2015) (determining "code segment [for performing a function]" to be sufficiently definite structure because the claim described the operation of the code segment); *Finjan, Inc. v. Proofpoint, Inc.*, No. 13-cv-05808-HSG, 2015 U.S. Dist. LEXIS 162504, at \*31-\*32 (N.D. Cal. Dec. 3, 2015) (determining "processor [for performing a function]" to be sufficiently definite structure because the claim described how the processor functions with the other claim components).

It is true that when a limitation is a means-plus-function limitation, and the corresponding structure is software, there needs to be an algorithm for the software or else the means-plus-function limitation will be considered indefinite unless the function can be performed by a general purpose computer. *See Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (holding that the corresponding disclosure for a computer-implemented means-plus-function claim is an algorithm). But that authority is not on point because that definiteness analysis is triggered only where the limitation is a means-plus-function limitation.

Here, Defendants have conflated the steps in the § 112, ¶ 6 analysis, by simply assuming that the limitation is a means-plus-function limitation. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-1299 (Fed. Cir. 2014) ("Requiring traditional physical structure in software limitations lacking the term means would result in all of these limitations being construed as means-plus-function limitations and subsequently being found indefinite."); *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) (holding that the district court erred by effectively treating "program" and "user interface code" as nonce words and concluding in turn that the claims recited means-plus-function limitations.).

## 2.  Court's Construction

For the reasons set forth above, the phrase **"an indicator configured to provide an indication that said mobile equipment, associated with a user digital identifier, and a second mobile equipment, associated with an agent digital identifier, meet a location based criterion, wherein said location based criterion facilitates a prospective business transaction involving a principal, an agent, and a user and said indication is regulated by at least: . . . and combinations thereof"** is not subject to § 112 ¶ 6, and is given its plain and ordinary meaning.

### G. "said machine implemented method" [Term No. 8]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "said machine implemented method" | "a method implemented by a machine" | Indefinite. |

#### 1. Analysis

The term "said machine implemented method" appears in Claim 6 of the '610 Patent. The parties dispute whether the term is indefinite because it lacks antecedent basis.[11]

Plaintiff argues that a person skilled in the art viewing the intrinsic evidence in context would understand that the "prospective business transaction" recited in Claim 6 provides at least implicit antecedent basis for "said machine implemented method." Plaintiff references independent Claim 1 that recites "[a] machine implemented method for facilitating a prospective business transaction." Plaintiff also refers to the specification and argues that a person skilled in the art would have no trouble determining that "said machine implemented method" refers to a machine implemented method that facilitates the "prospective business transaction" recited in Claim 6.

---

[11] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 20-21); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 16-17); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 16-17); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 7-8).

Defendants argue that Claim 6 is an apparatus claim that does not recite a "method" anywhere in the claim. Defendants contend that not only is there confusion over what the previously referenced "said machine implemented" method is, there is also an elemental confusion as to which "method" is being referenced by this term. Defendants argue that there is no way to know what constitutes the "method" in which the second mobile equipment would participate, or which machine would implement the method.

The Court finds the lack of antecedent basis renders the claim indefinite. The term "said machine implemented method" appears in every independent claim, and is generally introduced in the preamble or first element of each independent claim. For Claim 6, however, the preamble is shortened to "Mobile equipment comprising." Moreover, Plaintiff's reference to Claim 1 is unhelpful because Claim 1 is a method claim, where Claim 6 is an apparatus claim. It makes no sense for an apparatus claim that does not recite any method to refer to "*said* machine implemented method." Accordingly, the Court agrees with Defendants, and finds that they have shown with clear and convincing evidence that the claim is indefinite.

### 2. Court's Construction

The phrase **"said machine implemented method"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### H. "process" [Term Nos. 9, 10, 11, 12]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "a process for causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion" | Plain and ordinary meaning.<br><br>Not governed by 112(6). | Indefinite.<br>Governed by Section 112(6).<br>The function is "causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion."<br>There is no corresponding structure. |

| | | |
|---|---|---|
| "a process for regulating participation of said agent via a principal-controlled participation condition, wherein said principal controlled participation condition selectably enables said second mobile equipment, associated with said agent digital identifier, to participate to said machine implemented method" | Plain and ordinary meaning.<br><br>Not governed by 112(6). | Indefinite.<br>Governed by Section 112(6).<br>The function is "regulating participation of said agent via a principal-controlled participation condition, wherein said principal controlled participation condition selectably enables said second mobile equipment, associated with said agent digital identifier, to participate to said |
| "a process for causing the generation of indicia that said prospective business transaction has reached at least a predefined milestone selected from the group consisting of said prospective business transaction has been transacted, said business transaction has been preliminarily accepted by said user, an indication of the nearby presence of said agent has been delivered to said user, an indication of the nearby presence of said user has been | Plain and ordinary meaning.<br><br>Not governed by 112(6). | Indefinite.<br>Governed by Section 112(6).<br>The function is "causing the generation of indicia that said prospective business transaction has reached at least a predefined milestone selected from the group consisting of said prospective business transaction has been transacted, said business transaction has been preliminarily accepted by said user, an indication of the nearby presence of said agent has been delivered to said user, an indication of the nearby presence of said user has been delivered to said agent, and combinations thereof."<br><br>There is no corresponding structure. |
| "a process for regulating said causing the generation of indicia via a location based partition arrangement associated with said principal, wherein said agent digital identifier is one of a plurality of agent digital identifiers meeting said principal controlled participation condition and said agent digital identifier is assigned one out of a plurality of areas resulting from said partition." | Plain and ordinary meaning.<br><br>Not governed by 112(6). | Indefinite.<br>Governed by Section 112(6).<br>The function is "regulating said causing the generation of indicia via a location based partition arrangement associated with said principal, wherein said agent digital identifier is one of a plurality of agent digital identifiers meeting said principal controlled participation condition and said agent digital identifier is assigned one out of a plurality of areas resulting from said partition."<br>There is no corresponding structure. |

## 1. Analysis

The disputed phrases appear in Claims 10, 15, and 16 of the '610 Patent. The parties dispute

whether the phrases are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6.[12]

The Court finds that Claims 10, 15, and 16 are computer-readable medium claims, also known as a Beauregard claims. "A Beauregard claim—named after *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)—is a claim to a computer readable medium (*e.g.*, a disk, hard drive, or other data storage device) containing program instructions for a computer to perform a particular process." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011). The preamble of Claim 10 recites "[a] computer software system having a *set of instructions* stored in a *non-transitory computer-readable medium* . . . ." '610 Patent at Claim 10 (emphasis added). The Federal Circuit has instructed that *Beauregard* claims should be treated as method claims. *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.,* 672 F.3d 1270, 1275 n.1 (Fed. Cir. 2012) (Beauregard claims "should be treated as method claims to avoid 'exalt[ing] form over substance'") (quoting *CyberSource*, 654 F.3d at 1374).

Defendants contend that the claims are not Beauregard claims, and argue that the claims lack the well-known and precise structure. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) ("A Beauregard claim … is a claim to a computer readable medium … containing program instructions for a computer to perform a particular process."). According to Defendants, the claim is directed to a "software system" and not a "computer-readable medium."

The Court disagrees with Defendants' argument because the claim recites that the "software system" has a set of instructions stored in "a non-transitory computer-readable medium

---

[12] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 21-22); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 17-22); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 17-18); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 8-9).

for [performing a process]" *Uniloc 2017 LLC v. HTC Am., Inc.*, No. C18-1732 RSM, 2020 U.S. Dist. LEXIS 198952, at *24 n.8 (W.D. Wash. Oct. 26, 2020) (construing Beauregard claims and observing that "numerous courts have concluded that claim terms such as 'computer-readable medium,' 'computer readable storage medium,' executable . . . code,' 'executable software' and 'computer software' connote sufficient structure"); *Uniloc 2017 LLC v. Google LLC,* No. 2:18-CV-00492-JRG-RSP, 2020 U.S. Dist. LEXIS 18699, at *46 (E.D. Tex. Feb. 5, 2020) (construing Beauregard claims and finding that the term "computer-readable medium" connotes sufficiently definite structure to avoid application of § 112, ¶ 6). Accordingly, the Court finds that the computer-readable medium claims in the '610 Patent are not subject to § 112 ¶ 6.

Here, there is a rebuttable presumption that § 112 ¶ 6 does not apply because the claims do not recite the word "means."[13] Therefore, the analysis proceeds in two steps. Starting with the first step, Defendants argue that the claim term invokes means-plus-function treatment because it recites "a plurality of modules, said plurality of modules comprising: a process for …" Defendants contend that "module" is the most well-recognized nonce word. According to Defendants, the term "process" is just as generic as "module," because it recites a function performed by the "process." Defendants also contend that the claim merely recites a set of functions performed by a nonstructural processes and modules, invoking § 112(6). Defendants further argue that there is no corresponding structure in the specification for the "processes" set out in the two "process for" terms of Claim 10.

The Court finds that Defendants have conflated the steps in the § 112 ¶ 6 analysis. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-1299 (Fed. Cir. 2014) ("Requiring traditional physical

---

[13] Section "i. Rebuttable Presumption" in Section D includes a discussion of relevant case law regarding the rebuttable presumption.

structure in software limitations lacking the term means would result in all of these limitations being construed as means-plus-function limitations and subsequently being found indefinite."); *Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) (holding that the district court erred by effectively treating "program" and "user interface code" as nonce words and concluding in turn that the claims recited means-plus-function limitations.). The plain language of the claims indicate that disputed Term Nos. 9-12 describe the specific processes carried out by the "set of instructions" that are stored in the "non-transitory computer-readable medium." In other words, the claim language provides a description of how the computer-readable medium is specifically programmed to operate.

Thus, a person of ordinary skill in the art would understand that the claim language recites sufficient structure, and that the term "computer-readable medium" is not used as a generic term or black box recitations of structure or abstractions. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) ("a person of ordinary skill in the art could reasonably discern *from the claim language* that the words '*program*,' . . . and '*user interface code*,' . . . are used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional graphical user interface programs or code, existing in prior art at the time of the inventions.") (emphasis added).

It is true that when a limitation is a means-plus-function limitation, and the corresponding structure is software, there must be an algorithm for the software or else the means-plus-function limitation will be considered indefinite unless the function can be performed by a general purpose computer. *See Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (holding that the corresponding disclosure for a computer-implemented means-plus-function claim is an algorithm). But that authority is not on point because that definiteness analysis is

triggered only where the limitation is a means-plus-function limitation.

In summary, although the presumption against § 112 ¶ 6 is no longer "strong," it is still a presumption that Defendants must affirmatively overcome. In the context of the intrinsic record for the '610 Patent, the Court finds that Defendants have not shown that the "computer-readable medium" claims should be subject to § 112 ¶ 6. Accordingly, the Court rejects Defendants' argument that the "computer-readable medium" claims should be governed by § 112 ¶ 6, and finds that no further construction is required.

### 2.  Court's Construction

For the reasons set forth above, the phrase **"a process for causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion;"** the phrase **"a process for regulating participation of said agent via a principal-controlled participation condition, wherein said principal controlled participation condition selectably enables said second mobile equipment, associated with said agent digital identifier, to participate to said machine implemented method;"** the phrase **"a process for causing the generation of indicia that said prospective business transaction has reached at least a predefined milestone selected from the group consisting of said prospective business transaction has been transacted, said business transaction has been preliminarily accepted by said user, an indication of the nearby presence of said agent has been delivered to said user, an indication of the nearby presence of said user has been;"** and the phrase **"a process for regulating said causing the generation of indicia via a location based partition arrangement associated with said principal, wherein said agent digital identifier is one of a plurality of agent digital identifiers meeting said principal controlled participation condition**

and said agent digital identifier is assigned one out of a plurality of areas resulting from said

partition" are not subject to § 112 ¶ 6, and are given their plain and ordinary meaning.

## I.   "means for storing" [Term No. 13]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "means for storing, in at least one non-transitory computer-readable medium, computer program code adapted to facilitate, at least in part, a machine implemented method for advancing a prospective business transaction involving a principal, an agent, and a user" | Governed by Section 112(6).<br>The function is "storing, in at least one non- transitory computer readable medium, computer program code adapted to facilitate, at least in part, a machine implemented method for advancing a prospective business transaction involving a principal, an agent, and a user."<br>The corresponding structure is memory 102 in combination with controller 101 of server 100 shown in Figure 1 and described, for example, at col. 4, lines 33-37; col. 6, lines 34-50; col. 8, lines 41-46; and col. 13, lines 65 to col. 14, line 8.<br>To the extent an algorithm is necessary to describe the "program code" that is to be stored, such an algorithm is shown in Figures 3 and 6 and described at col. 8, lines 35-60 and col. 11, line 52 to col. 12, line 7. | Indefinite.<br>Governed by Section 112(6).<br>The function is "storing, in at least one non- transitory computer readable medium, computer program code adapted to facilitate, at least in part, a machine implemented method for advancing a prospective business transaction involving a principal, an agent, and a user."<br>There is no corresponding structure. |

### 1.   Analysis

The phrase "means for storing, in at least one non-transitory computer- readable medium,

computer program code adapted to facilitate, at least in part, a machine implemented method for

advancing a prospective business transaction involving a principal, an agent, and a user" appears

in Claim 17 of the '610 Patent. The parties agree this phrase is a means-plus-function term and

that the recited function is "storing, in at least one non-transitory computer-readable medium,

computer code adapted to facilitate, at least in part, a machine implemented method advancing a

prospective business transaction involving a principal, an agent, and a user." The parties dispute

whether the specification provides any description of corresponding structure. [14]

The Court finds that the phrase is governed by 35 U.S.C. § 112, ¶ 6. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic*, 248 F.3d at 1311. The Court agrees with the parties that the recited function is "storing, in at least one non-transitory computer-readable medium, computer code adapted to facilitate, at least in part, a machine implemented method advancing a prospective business transaction involving a principal, an agent, and a user."

Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Id*. The specification indicates that the code is stored on Memory 102. For example, the specification states that "a matching algorithm stored on Memory 102 may be overseeing all the functionalities necessary to ensure that user of User Equipment 165 receives a notification . . . ." '610 Patent at 6:45–48.

---

[14] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 22-23); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 22-24); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 18-20); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 9).



*Id.* at Figure 1. Similarly, the specification states that "[i]n the embodiment of FIG. 7, Agent Equipment 165 and User Equipment 160, satisfy the location portion of the matching algorithm stored in Memory 102 and running on Server 100." *Id.* at 12:26–29



FIG. 7

*Id.* at Figure 7. Likewise, the specification states that "[a] computer-readable medium may comprise a computer-readable storage medium that may be any media or means that can contain or store the instructions for use by or in connection with an instruction execution system, apparatus, or device, such as a computer." *Id.* at 14:4-8.

The specification further states that Agent Equipment 160 includes Memory 115 and Input/Output Module 116, and that User Equipment 165 includes Memory 120 and Input/Output Module 121. *See* Figures 1 and 7 above. Specifically, the specification states the following:

> Agent Equipment 160 carried by an agent, includes a Memory 115 wherein an application is stored and is running. Said Agent Equipment may further comprise an Input-Output Module 116 adapted to show indications of any match that may have occurred and further adapted to input any data or preference an agent may have. User Equipment 165 carried by a user, includes a Memory 120 wherein an application is also stored and is running. Said User Equipment 165 may further comprise an Input-Output Module 121 adapted to show indications of any match that may have occurred and further adapted to input any data or preference a user may have.

*Id.* at 3:14–25. The specification further indicates that data may be stored in server 100, Agent Equipment 160, and/or User Equipment 165. *See, e.g.*, '610 Patent at 6:31–41. Accordingly, the Court finds that the corresponding structure is: Memory 102 in combination with controller 101 of server 100; or Memory 115 and Input/Output Module 116 of Agent Equipment 160; or Memory 120 and Input/Output Module 121 of User Equipment 165 shown in Figure 1 or Figure 7 and equivalents thereof.

Defendants argue that Plaintiff does not provide any basis to suggest that these memories with their associated "modules" and "processors" perform any "storing" of code for "advancing a prospective business transaction involving a principal, an agent, and a user." The Court disagrees because storing is a simple function that can be achieved by any general purpose computer without special programming. *In re Katz Interactive Call Processing Patent Litig.*, 639 F.3d 1303, 1316 (Fed. Cir. 2011) ("Absent a possible narrower construction of the terms 'processing,' 'receiving,' and 'storing,' discussed below, those functions can be achieved by any general purpose computer without special programming. As such, it was not necessary to disclose more structure than the general purpose processor that performs those functions."). Accordingly, the Court finds that the corresponding structure is: Memory 102 in combination with controller 101 of server 100; or Memory 115 in combination with Input/Output Module 116 of Agent Equipment 160; or Memory 120 in combination with Input/Output Module 121 of User Equipment 165 shown in Figure 1 or Figure 7 and equivalents thereof.

Defendants correctly argue that the references to the specification included in Plaintiff's construction for the algorithm do not contain discussion of any structure that stores a computer program code that is adapted to facilitate a machine implemented method for advancing a prospective business transaction. Accordingly, the Court does not adopt this portion of Plaintiff's

construction.

### 2.  Court's Construction

In light of the intrinsic evidence, the Court finds that the phrase **"means for storing, in at least one non-transitory computer- readable medium, computer program code adapted to facilitate, at least in part, a machine implemented method for advancing a prospective business transaction involving a principal, an agent, and a user"** is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase as follows:

<u>**Function**</u>**: Storing, in at least one non- transitory computer readable medium, computer program code adapted to facilitate, at least in part, a machine implemented method for advancing a prospective business transaction involving a principal, an agent, and a user.**

<u>**Corresponding Structure**</u>**: Memory 102 in combination with controller 101 of server 100; or Memory 115 in combination with Input/Output Module 116 of Agent Equipment 160; or Memory 120 in combination with Input/Output Module 121 of User Equipment 165 shown in Figure 1 or Figure 7 and equivalents thereof.**

### J.  "means for causing" [Term No. 14]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "means for causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion, wherein said causing the generation of indicia is regulated by at least: an agent- user matching algorithm using predefined data selected from the group consisting of: data indicating a proclivity of said user toward predetermined business transactions, data related to terms of said prospective business transaction, wherein said terms are controlled by said principal, data related to parameters associated to said prospective business transaction, wherein said parameters are controlled by said principal, data related to a brand that is associated with said agent, data related to preferences associated with said user, wherein said preferences are controlled by said user, data related to user generated keywords indicating an explicit interest toward a predefined product, data related to user generated keywords indicating an explicit interest toward a predefined service, data related to patterns associated with said user, data related to attributes associated with said user, data related to locations associated with said prospective business transaction, wherein said locations are controlled by said principal, and combinations thereof; and a principal- controlled participation condition, wherein said principal controlled participation condition selectably enables said second mobile equipment associated with said agent digital identifier to participate in said machine implemented method for advancing said business transaction" | Governed by Section 112(6). The function is "causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion." The corresponding structure is memory 102 in combination with controller 101 of server 100 programmed to carry out the algorithm set forth in Figure 5 and described at col. 11, lines 20-51, or alternatively, Figure 9, and described at col. 13, lines 5-17. | Indefinite. Governed by Section 112(6). The function is "causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion, wherein said causing the generation of indicia is regulated by at least (a) an agent-user matching algorithm using predefined data selected from the group consisting of: data indicating a proclivity of said user toward predetermined business transactions, data related to terms of said prospective business transaction, wherein said terms are controlled by said principal, data related to parameters associated to said prospective business transaction, wherein said parameters are controlled by said principal, data related to a brand that is associated with said agent, data related to preferences associated with said user, wherein said preferences are controlled by said user, data related to user generated keywords indicating an explicit interest toward a predefined product, data related to user generated keywords indicating an explicit interest toward a predefined service, data related to patterns associated with said user, data related to attributes associated with said user, data related to locations associated with said prospective business transaction, wherein said locations are controlled by said principal, and combinations thereof; and (b) a principal controlled participation condition, wherein said principal-controlled participation condition selectably enables said second mobile equipment associated with said agent digital identifier to participate in said machine implemented method for advancing said business transaction". There is no corresponding structure. |

### 1.  Analysis

The disputed phrase appears in Claim 17 of the '610 Patent. The parties agree that this phrase is a means-plus-function term. The parties disagree on the recited function, and dispute whether the specification provides any description of corresponding structure.[15]

The Court finds that the disputed phrase is governed by 35 U.S.C. § 112, ¶ 6. "The first step in construing [a means-plus-function] limitation is a determination of the function of the means-plus-function limitation." *Medtronic*, 248 F.3d at 1311. Plaintiff contends that the recited function is "causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion." Defendants argue the recited function is the portion of the term following "means for." The Court finds that the recited function is "causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion."

To be clear, Defendants' proposed function includes the phrase that the Court determined above was not subject to § 112, ¶ 6. As discussed, the claim language provides the objectives of the "agent-user matching algorithm," and how the algorithm operates within the context of the claimed invention. Accordingly, the parties' dispute related to the term "agent-user matching algorithm" have been resolved.

Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248

---

[15] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 23-24); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 24-28); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 20); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 9).

F.3d at 1311. The specification indicates that the corresponding structure is Memory 102 in combination with controller 101 of server 100 programmed to carry out the agent-user matching algorithm and the principal-controlled participation condition. For example, the specification states that "a matching algorithm stored on Memory 102 may be overseeing all the functionalities necessary to ensure that user of User Equipment 165 receives a notification . . . ." '610 Patent at 6:45–50



*Id.* at Figure 1. Similarly, the specification states that "[i]n the embodiment of FIG. 7, Agent Equipment 165 and User Equipment 160, satisfy the location portion of the matching algorithm stored in Memory 102 and running on Server 100." *Id.* at 12:26–29.



**FIG. 7**

*Id.* at Figure 7. Likewise, the specification states that "[a] computer-readable medium may comprise a computer-readable storage medium that may be any media or means that can contain or store the instructions for use by or in connection with an instruction execution system, apparatus, or device, such as a computer." *Id.* at 14:4–8. The specification further states that the agent-user matching algorithm and the principal-controlled participation condition is further carried out in combination with: (i) Memory 115 and Input/Output Module 116 of Agent Equipment 160, or (ii) Memory 120 and Input/Output Module 121 of User Equipment 165. *See* Figures 1 and 7 above. Specifically, the specification states the following:

> Agent Equipment 160 carried by an agent, includes a Memory 115 wherein an application is stored and is running. Said Agent Equipment may further comprise an Input-Output Module 116 adapted to show indications of any match that may have occurred and further adapted to input any data or preference an agent may have. User Equipment 165 carried by a user, includes a Memory 120 wherein an application is also stored and is running. Said User Equipment 165 may further comprise an Input-Output Module 121 adapted to show indications of any match

that may have occurred and further adapted to input any data or preference a user
may have.

*Id.* at 3:14–25. Moreover, the claim language itself does not require "generation of indicia" at all

three locations. Accordingly, the Court finds that the corresponding structure is: Memory 102 in

combination with controller 101 of server 100 programmed to carry out the agent-user matching

algorithm and the principal-controlled participation condition in combination with: (i) Memory

115 and Input/Output Module 116 of Agent Equipment 160, or (ii) Memory 120 and Input/Output

Module 121 of User Equipment 165 and equivalents thereof.

Defendants correctly argue that the references to the specification included in Plaintiff's

construction do not mention generation of any indicia, or the generation of any indicia specifically

for purposes of indicating that a user mobile equipment and an agent mobile equipment "meet a

location based criterion." Accordingly, the Court does not adopt this portion of Plaintiff's

proposal.

## 2.  Court's Construction

In light of the intrinsic evidence, the Court finds that the phrase **"means for causing the
generation of indicia that a first mobile equipment, that is associated with a user digital
identifier, and a second mobile equipment, that is associated with an agent digital identifier,
meet a location based criterion, wherein said causing the generation of indicia is regulated
by at least: an agent- user matching algorithm using predefined data selected from the group
consisting of: data indicating a proclivity of said user toward predetermined business
transactions, data related to terms of said prospective business transaction, wherein said
terms are controlled by said principal, data related to parameters associated to said
prospective business transaction, wherein said parameters are controlled by said principal,
data related to a brand that is associated with said agent, data related to preferences**

**associated with said user, wherein said preferences are controlled by said user, data related to user generated keywords indicating an explicit interest toward a predefined product, data related to user generated keywords indicating an explicit interest toward a predefined service, data related to patterns associated with said user, data related to attributes associated with said user, data related to locations associated with said prospective business transaction, wherein said locations are controlled by said principal, and combinations thereof; and a principal- controlled participation condition, wherein said principal controlled participation condition selectably enables said second mobile equipment associated with said agent digital identifier to participate in said machine implemented method for advancing said business transaction"** is governed by 35 U.S.C. § 112, ¶ 6, and construes the phrase as follows:

**Function**: **Causing the generation of indicia that a first mobile equipment, that is associated with a user digital identifier, and a second mobile equipment, that is associated with an agent digital identifier, meet a location based criterion.**

**Corresponding Structure**: **Memory 102 in combination with controller 101 of server 100 programmed to carry out the agent-user matching algorithm and the principal-controlled participation condition in combination with: (i) Memory 115 and Input/Output Module 116 of Agent Equipment 160, or (ii) Memory 120 and Input/Output Module 121 of User Equipment 165 and equivalents thereof.**

**K.  "said causing" [Term No. 15]**

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "said causing the generation of indicia is additionally regulated by program code, stored on said one non-transitory computer readable medium, that is adapted to enable a prioritization scheme among agent digital identifiers, wherein said agent digital identifier is one of a plurality of agent digital identifiers that meet said principal-controlled participation condition." | Plain and ordinary meaning.<br><br>Not governed by 112(6). | Indefinite.<br>Governed by Section 112(6).<br>This term adds an additional function to the "means for causing" element in claim 17.<br><br>The additional function is "enabling a prioritization scheme among agent digital identifiers, wherein said agent digital identifier is one of a plurality of agent digital identifiers that meet said principal controlled participation condition."<br>There is no corresponding structure. |

## 1.  Analysis

The phrase "said causing the generation of indicia is additionally regulated by program code, stored on said one non- transitory computer readable medium, that is adapted to enable a prioritization scheme among agent digital identifiers, wherein said agent digital identifier is one of a plurality of agent digital identifiers that meet said principal-controlled participation condition" appears in Claim 20 of the '610 Patent. The parties dispute whether the phrase is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6.[16]

The Court finds that the phrase is a means-plus-function term governed by 35 U.S.C. § 112, ¶ 6. This term is found in dependent Claim 20, and further limits the "means for causing" term in Claim 17, which the parties agree is subject to §112(6). Specifically, "said causing the generation of indicia . . ." in Claim 20 refers to the "means for causing the generation of indicia . . ." in Claim 17. Thus, this term is a means-plus-function term that further limits the scope of the claims by "enabling a prioritization scheme among agent digital identifiers that meet said

---

[16] The parties' arguments for this disputed phrase can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 24); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 28-29); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 20-21).

principal-controlled participation condition."

Having determined the limitation's function, "the next step is to determine the corresponding structure disclosed in the specification and equivalents thereof." *Medtronic*, 248 F.3d at 1311. As discussed, this term is found in a dependent claim that adds to the "means for causing." However, unlike the previous term, no structure is disclosed for the "a prioritization scheme." Nowhere in the specification and prosecution history of the '610 Patent is there a discussion of any structure that facilitate these functionalities. In fact, the terms "prioritize," "prioritization," and "prioritization scheme" do not appear in the specification. Accordingly, the specification fails to disclose any corresponding structure that performs the recited function.

### 2.  Court's Construction

In light of the intrinsic evidence, the Court finds that the phrase **"said causing the generation of indicia is additionally regulated by program code, stored on said one non-transitory computer readable medium, that is adapted to enable a prioritization scheme among agent digital identifiers, wherein said agent digital identifier is one of a plurality of agent digital identifiers that meet said principal-controlled participation condition"** is governed by 35 U.S.C. § 112, ¶ 6. The Court construes the phrase as follows:

**Function**: **Enabling a prioritization scheme among agent digital identifiers that meet said principal-controlled participation condition.**

**Corresponding Structure**: **There is no corresponding structure, therefore the claim is indefinite.**

### L.  "location based partition arrangement" [Term No. 16]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "location based partition arrangement" | Plain and ordinary meaning. | Indefinite. |

### 1. Analysis

The term "location based partition arrangement" appears in Claim 16 of the '610 Patent. The parties dispute whether the term "location based partition arrangement" is indefinite.[17] The parties agree that the term "location based partition arrangement" in Claim 16 is used to further modify the "process for causing the generation of indicia" in Claim 10.

Plaintiff argues that the regulating is "via a location based partition arrangement associated with said principal." According to Plaintiff, the specification contains teachings of a principal dividing agents into groups or otherwise distinguishing between agents. Dkt. #54 at 21 (citing '610 Patent at 5:52–55 ("… the principal could also create hierarchies among agents so that the probability of agents interfering with each other will be minimized."), 5:62–67 ("… in case of multiple agents and multiple users in the same area…the algorithm contained in Memory 102 and running on Server 100 may distribute and rebalance the load among agents according to a range of principal's preferences."). Plaintiff argues that Defendants have failed to meet their burden of showing this term is indefinite by clear and convincing evidence.

Defendants argue that nowhere in the intrinsic record did the patentee identify what a "location based partition arrangement" is or how it could be "associated with [a] principal" as required by Claim 16. Defendants further argue that the phrase "partition arrangement" (whether based on location or not) does not appear in the intrinsic record. Defendants contend that a person of ordinary skill in the art would not understand whether the term refers to a partitioning of locations, arrangement of partitions, partitioning of agents based on their locations, partitioning of users based on their locations, or a partitioning of agent-user pairs based on their respective

---

[17] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 24-25); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 30); and Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 21-22).

locations. The Court agrees with Defendants and finds that the term is indefinite.

Given that the term "partition arrangement" does not appear in the specification, a person of ordinary skill would not understand whether the term refers to a partitioning of locations, arrangement of partitions, partitioning of agents based on their locations, partitioning of users based on their locations, or a partitioning of agent-user pairs based on their respective locations. Accordingly, the term "location based partition arrangement" is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### 2. Court's Construction

The term **"location based partition arrangement"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### M. "session area" [Term No. 17]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "session area" | "a defined area having at least one predetermined functionality associated therewith, the boundaries of which are electronically defined" | Indefinite. |

### 1. Analysis

The term "session area" appears in Claim 1, 2, 4, 6, 8, 9, 12, and 13 of the '476 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "sessions area" is indefinite because of statements made by the patentee during the prosecution of the parent application to the '476 Patent (U.S. Patent App. No. 14/044,615) and in the pending continuation application to the '476 Patent.[18]

---

[18] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 25-26); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 30-34); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 22-23); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 10-11).

The Court finds that the term is not indefinite, because it is used in a consistent manner to refer to "a virtual area anchored to at least one reference point where at least one predefined functionality is enabled." The Background section of the specification discusses a geofence and location technologies as follows:

> *A geofence is a virtual perimeter for a real-world geographic area.* It can be generated dynamically as in a radius around a point location such as a bar or a restaurant. A geofence can be also be generated within the perimeter of a physical location. In one implementation, a geofence can be a predefined set of boundaries connecting points expressed by latitude and longitude. Alternatively a geofence can be an area containing points with similar characteristics, e.g., within the radius of one or more RF-ID reader apparatus or iBeacon apparatus.
>
> Geofencing has been made possible especially by the introduction of GPS (Global Positioning System) technology and the miniaturization of electronic components that have made the locationing functionality a standard feature in Mobile Phones and portable electronics in general.
>
> Geofencing can be implemented via many positioning techniques, both indoor and outdoor, such as by means of detection by an RF-ID reader, Wi-Fi, Bluetooth mapping, accelerometers, gyroscopes, altimeters, magnetometers, or led detection modules, just to cite a few examples.
>
> Locationing techniques coupled with mobile telecommunications technology have opened the door to novel, machine-assisted methods for facilitating and conducting business transactions. For example, the above-mentioned application "Method and Apparatus for a Principal/Agent Based Mobile Commerce" discloses a location-based mobile commerce method based on three actors: 1) a user, 2) an agent and a 3) principal. In said disclosure, an agent, e.g. a trusted customer of a certain brand, can be empowered by a principal, e.g. a car dealer for said brand, to represent said principal with deals or offers that have been preapproved by said principal.
>
> *Geofencing and location technologies in general, can trigger or inhibit functionalities of location-aware apparatuses.* For example, as described in U.S. Pat. No. 7,813,741 titled "System and Method for Initiating Responses to Location-Based Events", a system may provide a response to one or more location-based services applications to supply location-based services, such as email, instant messaging, paging and the like.
>
> In other enactments, systems can make available location-based information and functionalities in various ways, as described for example in U.S. Pat. No. 8,150,439 titled "Facilitating user interactions based on proximity."

'476 Patent at 1:39–2:15 (emphasis added). It is within this context that the specification describes

the recited "session area" as follows:

> In FIG. 1 *Session Area 190 is an area, also centered on Location 180 where certain predetermined functionalities are enabled.* For example, User Equipment 160 and 165, by virtue of being positioned within Session Area 190 may interact, exchange electronic business cards, or close predetermined business deals.



*Id.* at 3:65–4:3, Figure 1. Thus, the specification indicates that the "session area" is an area where at least one predefined functionality is enabled. However, the specification indicates that Figure 1 represents one embodiment and that the Session Area is not limited to geofencing:

> FIG. 1 represents just one of the many possible embodiments of the present invention. In fact, Session Area 190 and Notification Area 185 could overlap or be far away from each other so that a plurality of different access points or base stations (AP/BS) could be needed to serve User Equipment 170, 165 and 160 in different areas. *Moreover, Session Area 190 and Notification Area 185 could be defined not only by means of geofencing but also by many other techniques*, for example, the range of the radio communication link type employed by Access Point/Base Station (AP/BS) 135 or the range of an RF-ID reader or even physical walls or fences coupled with any system apt to detect the presence of a user within said walls or fences such as an RF-ID reader or an Indoor positioning systems (IPS).

*Id.* at 8:9–22 (emphasis added). Indeed, the specification states that Session Area 190 should be

interpreted broadly:

> *For the purposes of the present application, Session Area 190 should be interpreted broadly and consistently with the advances of technology in the area of locationing techniques.* In one implementation, Session Area 190 may extend beyond the physical location of a building such as a bar or a mall, for which Location 180 could be a proxy. In another implementation, Location 180 can be centered on the instantaneous position of user equipment and be activated by said particular user equipment without any reference to a physical building or establishment.
>
> In another implementation, Session Area 190 may be contained within the perimeter of a building and an indoor positioning system may define its boundaries. In another implementation, the boundaries of Session Area 190 can be defined by the physical walls of a room in a building coupled with a system to detect presence of a particular user within those walls. An RF-ID system may provide both a presence detection function and an identity discovery function of a user within said walls.

*Id.* at 8:66–9:17 (emphasis added). Given this intrinsic evidence, a person of ordinary skill in the art would understand that "session area" means "a virtual area anchored to at least one reference point where at least one predefined functionality is enabled."

Turning to the indefinite argument, Defendants contend that the term "sessions area" is indefinite because of statements made by the patentee during the prosecution of the parent application to the '476 Patent (U.S. Patent App. No. 14/044,615) and in the pending continuation application to the '476 Patent. Defendants argue that the patentee "defined and described" the term "session area" multiple times in "irreconcilably different" ways. Defendants first point to the following excerpt from the prosecution history:

> A session area, *in one implementation of the current application*, is the output of the combination of a location-based criterion and an admission criterion. It does not require users in all implementations. Users may not have joined a session area or a session area could be in a passive status, but never the less a session area may exist independently from users.

Dkt. #51 at 31 (citing Dkt. #51.4 at 96) (emphasis added). Defendants also base their argument on a handful of other statements made during the prosecution history, including statements that a session area can be "specific to a particular physical space," "generated around a reference point,"

"be defined by a series of lines forming a perimeter." Dkt #51 at 31 (citing Dkt. #51-3 at 157, 217). Defendants argue that the patentee's statement that a "session area" is an "output" that is generated based on certain changeable criteria contradicts the patentee's later statement that a "session area" is a "a predetermined area" or a "geofence (that can be created according to different techniques) and is associated with functionalities." According to Defendants, an "output" of a function generated by certain inputs is not "predetermined."

The Court disagrees with Defendants' characterization of the prosecution history. As an initial matter, it is important to note that Defendants did not argue that "session area" is not used consistently in the written description, drawings and claims of the '476 Patent. Instead, all of Defendants' arguments relate to the prosecution history of other patents. The Court agrees that this intrinsic evidence can be relevant and should be considered, but ultimately finds that it is not persuasive in this instance. To be a disclaimer or definitional, the statements in prosecution history must be clear and unambiguous and constitute a clear disavowal of the scope. *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1306 (Fed. Cir. 2007).

This is the problem with Defendants' argument, the "output" statement is not a definition of a session area, but rather one implementation, or one embodiment. Moreover, the other quotes that Defendants argue from the prosecution history are not express "definitions" of the term "session area." More importantly, the statements are not inconsistent, but instead are descriptions of particular aspects and implementations of session areas.

Likewise, the claims themselves define the scope of the term "session area." For example, Claims 1 and 9 recite that the "session area": (a) exhibits at least one set of spatial boundaries, and (b) is associated with at least one time-related parameter defining at least one functionality connected with the session area. Claim 1 further requires that the session area be anchored to at

least one reference point. Moreover, the term "session area" appears numerous times throughout the '476 Patent, and in view of the detailed description provided in the '476 Patent, there is no reason to believe that a person skilled in the art would encounter difficulty understanding what is meant based on the prosecution of the parent application to the '476 Patent (U.S. Patent App. No. 14/044,615) and in the pending continuation application to the '476 Patent. Accordingly, Defendants have failed to prove by clear and convincing evidence that the term "session area" is indefinite.

### 2.  Court's Construction

The Court finds that the phrase **"session area"** is not indefinite, and is construed to mean **"a virtual area anchored to at least one reference point where at least one predefined functionality is enabled."**

### N.  "authority" [Term No. 18]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "authority" | Plain and ordinary meaning. | "an entity that via a networked machine can selectively enable and disable the association of agents' mobile equipment to a roster of active mobile equipment apparatuses linked to agents" |

### 1.  Analysis

The term "authority" appears in Claims 1, 8, 9, and 11 of the '476 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the patentee explicitly defined the term "authority" during the prosecution of the child application to the '476 Patent.[19]

---

[19] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 26-27); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 34-35); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 23-24); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 10-11).

The Court finds that the patentee explicitly defined the term "authority" during prosecution. Specifically, the patentee argued the following during the prosecution of the child application to the '476 Patent:

> The main piece of prior art relied upon by Examiner is U.S. 20140045516 (hereinafter *Turgman*). *Turgman* is disclosing movable geofences anchored to users. These are used to match users falling within the boundaries of those geofences. Applicant respectfully points out that *Turgman* is equivalent to Applicant's patent U.S.8600361B2 with priority 1999. In Applicant's opinion, the geofence that is anchored to a user in *Turgman* is equivalent to the radius parameter that he disclosed more than twenty years ago.
>
> Applicant in his patent application incorporates by reference his own patent application US13/541,737, now patent US9286610B2, describing a "Method and apparatus for a principal / agent based mobile commerce". The limitation "authority" in the claims refers to a principal. A principal, as described in the present application and the applications incorporated by reference, is an entity that via a networked machine or "authority server", can selectively enable and disable the association of agents' mobile equipment to a roster of active mobile equipment apparatuses linked to agents.
>
> Examiner in his office action equates "authority" with a "matching engine" as described in Turgman. In Applicant's respectful opinion, this seems farfetched. Differently from a search engine, an authority server enables functionalities, monitoring, and analytics that are not an instantaneous output such as the result of a search engine. An authority server, as described in the specifications and claims of record, activates, monitors, enables, and controls both mobile equipment and session areas over time providing a networked service.

Dkt. #51-5 at 417 (highlight added). Here, the patentee referenced the '610 Patent (*i.e.*, Patent Application US13/541,737), and argued that the term "authority" refers to a "principal." And like the prosecution history for the '610 Patent, the patentee provided an explicit definition of a "principal." The definition was provided to clearly and unambiguously support the argument that the "authority" was not the disclosed "matching engine." This understanding is consistent with the specification of the '476 Patent, which incorporates the teachings of the '610 Patent by reference ('476 Patent at 1:24-33), and states that "the above-mentioned application 'Method and Apparatus

for a Principal/ Agent Based Mobile Commerce' discloses a location-based mobile commerce method based on three actors: 1) a user, 2) an agent and a 3) principal." '476 Patent at 1:62–66.

Plaintiff argues that the intrinsic record does not contain any lexicography, disavowal, or disclaimer that justifies departing from the plain meaning as understood by skilled artisans. Plaintiff contends that one statement made in the prosecution of a different patent application does not constitute a "clear and unmistakable" surrender of subject matter for the '476 Patent. The Court disagrees with Plaintiff's characterization of the prosecution history. The Federal Circuit has "held that the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application." *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (citing cases); *see also ACQIS, LLC v. Appro Int'l, Inc.*, No. 6:09 CV 148, 2011 U.S. Dist. LEXIS 10515, at *20 (E.D. Tex. Feb. 3, 2011) (holding that statements made "during prosecution of a continuation application" are "still relevant intrinsic evidence"). As discussed above, the patentee stated that the recited "authority" refers to a "principal," and provided an explicit definition of the term.

### 2.  Court's Construction

For the reasons set forth above, the Court construes the term **"authority"** to mean **"an entity that via a networked machine can selectively enable and disable the association of agents' mobile equipment to a roster of active mobile equipment apparatuses linked to agents"**

### O.  "the strongest connection" [Term No. 19]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "facilitating determining which user among said second plurality of users has the strongest connection with said reference point based, at least in part, on that user's location [on time spent within said at least one first set of spatial boundaries]" | Plain and ordinary meaning. | Indefinite. |

### 1.  Analysis

The phrase "facilitating determining which user among said second plurality of users has the strongest connection with said reference point based, at least in part, on that user's location [on time spent within said at least one first set of spatial boundaries]" appears in Claims 1 and 9 of the '476 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the term "the strongest connection" is indefinite.[20]

The Court finds that the claim language itself "provide[s] enough certainty to one of skill in the art when read in the context of the invention." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (internal quotations and citations omitted). Defendants correctly argue that the only reference to the strength of a "connection" in the specification states that an agent's "permanence's analytic [may] indicate a stronger connection with the Session Area 190 or Location 180." '476 Patent at 16:54–59. However, Defendants ignore the surrounding claim language. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claim construction inquiry ... begins and ends in all cases with the actual words of the claim.").

Claim 1 states that the strength of the user's connection with the reference point is based,

---

[20] The parties' arguments for this disputed phrase can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 27); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 35-36); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 24-26); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 11).

at least in part, on the user's location with respect to the reference point. In other words, a user having a location close to the reference point has a stronger connection to the reference point than a user having a location further away from the reference point. The proximity between the reference point and a user constitutes an objective standard for measuring the term of degree, and one of skill in the art would have no difficulty determining which user out of a group of users has the "strongest" connection to a reference point based on location. The specification provides an example of "a method to create and arrange a list of users as, e.g., the list described in FIG. 3 at Screen 300 according to proximity." '476 Patent at 22:4–22.

Claim 9 recites a similar, but different objective standard. Specifically, Claim 9 recites that the strongest connection to a session area is determined based, at least in part, on time spent within a set of spatial boundaries associated with the session area, such that said second plurality of users are ranked one above the other according to status. In other words, the user with the "strongest connection" to a session area is the user who has the largest amount of time spent within special boundaries associated with that session area. The specification provides an example of using "space interaction requests in time or rearrange interaction requests according to certain priorities and criteria such as premium subscription, time spent within the session area, recurrence within the session area, or usage of the application, just to cite a few examples." *Id.* at 10:38–43. Accordingly. Defendants failed to prove by clear and convincing evidence that the phrase including the term "the strongest connection" is indefinite.

### 2. Court's Construction

The Court finds that the phrase **"facilitating determining which user among said second plurality of users has the strongest connection with said reference point based, at least in part, on that user's location [on time spent within said at least one first set of spatial**

**boundaries]"** is not indefinite, and is given its **plain and ordinary meaning**.

### P.   "said reference point" [Term No. 20]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "said reference point" | Plain and ordinary meaning. | Indefinite. |

### 1.   Analysis

The term "said reference point" appears in Claim 1 of the '476 Patent. The parties dispute whether the term "said reference point" is indefinite because it lacks antecedent basis, and whether the previous references to the term "reference point" in the claim renders the claim indefinite.[21]

Defendants incorrectly contend that the term "said reference point" lacks antecedent basis. The term "said reference point" refers to the "at least one reference point" recited earlier in the claim. Claim 1 reads, in relevant part, as follows:

> … a) said session area is anchored to *at least one reference point*…

> …facilitating determining which user among said second plurality of users has the strongest connection with *said reference point* based, at least in part, on that user's location…

'476 Patent at Claim 1 (emphasis added). Plaintiff contends that there is no other "reference point" recited in the claim. Plaintiff further argues that reference points are described in the disclosure. For example, the specification states that "a profile may only be visible in geofences that are located in places that are at least a hundred miles from a reference point, for example home." *Id.* at 11:50–53. According to Plaintiff, a reference point is a point used as a reference.

The Court agrees with Plaintiff that the term is not indefinite for lack of antecedent basis.

---

[21] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 27-28); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 36-37); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 26); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 11).

Notwithstanding, the Court finds that the term is indefinite because Claim 1 leaves open the possibility that there are multiple "reference points" that the "session area is anchored to." Having more than one reference in the abstract would not be problematic. But here there is ambiguity over the "reference point" that is used to determine which user has "the strongest connection with said reference point." As discussed with the previous term, Claim 1 states that the strength of the user's connection with the reference point is based, at least in part, on the user's location with respect to the reference point. Given that the claim language introduces the possibility that there are multiple "reference points" that the "session area is anchored to," it is unclear which reference point should be used to determine "which user among said second plurality of users has the strongest connection with said reference point." Accordingly, a person of ordinary skill in the art would not know when or how to "facilitate[e] activating a timer associated with said one user."

Plaintiff argues that the claim language is no different than if the claim recited "a reference point" and then "said reference point," or "at least a first reference point" and then "said first reference point." However, Claim 1 does not actually recite this hypothetical language. Instead, the Court would have to improperly redraft the claim as Plaintiff proposes. Accordingly, Defendants have shown that the claim is indefinite by clear and convincing evidence.

### 2. Court's Construction

The term **"said reference point"** is indefinite for failing to inform, with reasonable certainty, those skilled in the art about the scope of the invention.

### Q. "quality of interactions" [Term No. 21]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "facilitating activating a timer associated with said one user among said second plurality of users such that if a task is not accomplished by said one user among said second plurality of users, an association with said at least one user among said first plurality of users is inhibited, at least temporarily, and thus the quality of interactions between said first plurality of users and said second plurality of users is regulated" | Plain and ordinary meaning. | Indefinite. |

### 1. Analysis

The phrase "facilitating activating a timer associated with said one user among said second plurality of users such that if a task is not accomplished by said one user among said second plurality of users, an association with said at least one user among said first plurality of users is inhibited, at least temporarily, and thus the quality of interactions between said first plurality of users and said second plurality of users is regulated" appears in Claim 1 and 9 of the '476 Patent. The Court finds that the phrase is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether the intrinsic record explains what is meant by the term "quality of interactions," or how the "quality of interactions" can be "regulated."[22]

The Court finds that the claim language itself "provide[s] enough certainty to one of skill in the art when read in the context of the invention." *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (internal quotations and citations omitted). Defendants argue that the specification does not provide any guidance for determining the "quality" of an "interaction,"

---

[22] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 28); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 37-38); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 26-27); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 11-12).

and that there is no standard or any objective boundary of what determines "quality." Defendants further argue that the word "quality" is mentioned once in the specification, and that sentence states that "the quality of the interactions" can be regulated. '476 Patent at 10:28–30. According to Defendants, there is no guidance as to what "quality" means or how to measure it. Defendants also argue that the patentee acquiesced that the term is indefinite in the '476 child application.

The Court finds that Defendants have not shown that the term is indefinite by clear and convincing evidence. Defendants ignore the surrounding claim language, which sets out how the "quality of interactions" is regulated via a specific method. *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1248 (Fed. Cir. 1998) ("The claim construction inquiry ... begins and ends in all cases with the actual words of the claim.").

The method of Claim 1 recites that a timer is activated having an expiration. The claim further recites that if a requisite action is not taken by the user before the expiration of the timer, an association between that user and other users is inhibited. If these time-management steps are taken, this constitutes "regulation" of the "quality of interactions" between the users. "Quality," in this context, is used to essentially mean "timeliness," but the claim requires no minimum or maximum value for "quality" or timeliness. Instead, the claim only requires that the quality / timeliness be regulated according to the recited steps. This language informs, with reasonable certainty, those skilled in the art about the scope of the invention. Accordingly. Defendants have failed to prove by clear and convincing evidence that the phrase containing the term "quality of interactions" is indefinite.

### 2.   Court's Construction

The Court finds that the phrase **"facilitating activating a timer associated with said one user among said second plurality of users such that if a task is not accomplished by said one**

**user among said second plurality of users, an association with said at least one user among said first plurality of users is inhibited, at least temporarily, and thus the quality of interactions between said first plurality of users and said second plurality of users is regulated"** is not indefinite, and is given its **plain and ordinary meaning**.

### R. "interferences among said second plurality of users are minimized" [Term No. 22]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "interferences among said second plurality of users are minimized" | Plain and ordinary meaning. | Indefinite. |

#### 1. Analysis

The phrase "interferences among said second plurality of users are minimized" appears in Claim 8 of the '476 Patent. The parties dispute whether the phrase is indefinite.[23] The Court finds that the phrase is not indefinite.

Defendants argue that "minimized" means to reduce to the lowest possible value. Defendants contend that the intrinsic record fails to explain or set forth what this lowest possible value could be, and that the specification defines no clear units of measurement in which to measure the lowest possible value. According to Defendants, Plaintiff offers no valid intrinsic or extrinsic evidence showing how one would measure whether "interferences" are "minimized."

Defendants have failed to show that the phrase is indefinite by clear and convincing evidence. Claim 8 recites that certain users are associated with boundaries within which certain users enjoy certain privileges. Similarly, the specification discloses that privileges may be afforded to users within an area. For example, the specification states that "an algorithm may regulate

---

[23] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 28-29); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 38-39); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 27-28); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 12).

certain functionalities or privileges afforded to users within the session area according to said degree of correlation score with the session area model-profile." '476 Patent at 15:1–4. The specification further discloses the potential for an imbalance or overpopulation of users of the same type conducting conflicting activities in the same geographical area and thereby interfering with one another.

The specification refers to this situation as a "tragedy of the commons" problem. *Id.* at 10:26–30 ("For example, a user in Session Area 190 may only be able to send a number N of requests for interactions during an active session time window. This can be done to avoid tragedy of the commons problems and regulate the quality of the interactions."), *id.* at 12:22–25 ("If too many active areas have been created in or around the same location, the system may prevent the creation of more active areas to prevent abuse or 'tragedy of the commons' situations"); *id.* at 20:48–53 ("The person skilled in the art will understand that the functionality described in FIG. 5 may allow many users to quickly create an active Session Area 190 wherever they are located. This may create a tragedy of the commons problem whenever many users are concentrated in the same area and want to create active session areas"). Accordingly, the intrinsic evidence indicates what "interferences among users" are and describes how and why they are minimized. Thus, Defendants have failed to prove by clear and convincing evidence that the term "quality of interactions" is indefinite.

### 2.  Court's Construction

The Court finds that the phrase **"interferences among said second plurality of users are minimized"** is not indefinite, and is given its **plain and ordinary meaning**.

### S.  "interactive networking functionality" [Term No. 28]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "interactive networking functionality" | "a networking functionality providing an opportunity for a user and agent to interact". | "interactive professional networking functionality" |

### 1. Analysis

The term "interactive networking functionality" appears in Claims 1, 9, and 13 of the '476 Patent. The Court finds that the term is used consistently in the claims and is intended to have the same general meaning in each claim. The parties dispute whether networking" is limited to "professional networking," as Defendants contend. [24]

Defendants argue that each reference to the term "networking" in the specification concerns "professional networking." Dkt. #51 at 46 (citing '476 Patent at 5:34–40, 9:59–61, 10:44–58, 11:23–25, 26:27–41, 26:55–57, 31:38–42, 30:35–45). According to Defendants, the specification equates "networking" to using services such as LinkedIn, and distinguishes "networking" from "dating, conducting business or other activities." Dkt. #51 at 47 (citing '476 Patent at 5:34–40; 26:55–57). Defendants argue that there is not a single reference to "networking" in the patent that relates to "telecommunications networking."

For a patentee to have been deemed to act as his own lexicographer, it is necessary to show that the patentee "clearly set forth a definition of the disputed claim term," and "clearly express an intent to define the term." *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014). The Court finds that the patentee did not clearly set forth a definition of "networking," and did not clearly express an intent to define the term "networking" in the manner that Defendants propose. Instead, the patentee provided a number of examples of how the networking

---

[24] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 30-31); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 46-47); Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 30-31); and Defendants' Sur-Reply Claim Construction Brief (Dkt. #58 at 12).

functionalities may be enabled.

For example, the Abstract states that "[i]n accordance with one example embodiment of the present invention a method comprises at least partially enabling a set of functionalities and attributes associated to an area for facilitating business transactions, networking activities, or social interactions of users who are within, proximate, or associated, at least provisionally, with said area." '476 Patent at Abstract. Similarly, the specification states that "[i]n one implementation, User Equipment 160 can be representative of a professional looking forward to extend the reach of his office or a generic user who is looking forward to interactions with other fellow users for networking or dating purposes." *Id.* at 5:34–38.

Accordingly, the intrinsic evidence does not limit "networking" to "professional" networking, but instead generally refers to "networking functionality that provides an opportunity for users to interact." In other words, the Court disagrees that the specification distinguishes "networking" from "dating, conducting business or other activities." Accordingly, Defendants' construction would improperly redraft the claim to limit networking to "professional" networking.

### 2.   Court's Construction

For the reasons set forth above, the Court construes the term **"interactive networking functionality"** to mean **"networking functionality that provides an opportunity for users to interact."**

### T.   "process" [Term Nos. 23, 24, 26, 27, 29, 30, 32]

| Disputed Term | Plaintiff's Proposal | Defendants' Proposal |
|---|---|---|
| "process for facilitating fruition of functionalities associated with a session area via a location aware mobile application; wherein: a) said session area exhibits at least one first set of spatial boundaries; b) said session area is associated with at least one time related parameter defining at least one functionality connected with said session area;" | Plain and ordinary meaning. Not governed by 112(6). Alternatively, if governed by Section 112(6), the function is "facilitating fruition of functionalities associated with a session area via a location aware mobile application." The structure/acts are memory 102 in combination with controller 101 of server 100 programmed to implementing the algorithms disclosed in applicant's specification, wherein a location aware mobile application is represented in Fig. 3. The mobile application is contained in a user equipment as described in Fig. 4. The process is regulated via Controller 101. The set of spatial boundaries data are stored in Memory 102. In column 10 at line 17 is described, e.g., a timer and a time threshold (a time related parameter). | Indefinite. Governed by Section 112(6). The function is "facilitating fruition of functionalities associated with a session area via a location aware mobile application; wherein (a) said session area exhibits at least one first set of spatial boundaries; and (b) said session area is associated with at least one time related parameter defining at least one functionality connected with said session area." There is no corresponding structure. "facilitating fruition of functionalities associated with a session area" is indefinite. |
| "a process for facilitating association with said session area of at least one user among a first plurality of users based, at least in part, on determining said at least one user's location" | Plain and ordinary meaning. | Indefinite. Governed by Section 112(6). The function is "facilitating association with said session area of at least one user among a first plurality of users based, at least in part, on determining said at least one user's location." There is no corresponding structure |
| "a process for facilitating selectively enabling the activation of a second plurality of users by an authority, wherein said activation allows the selective association of said second plurality of users with said first plurality of users" | Plain and ordinary meaning. | Indefinite. Governed by Section 112(6). The function is "facilitating selectively enabling the activation of a second plurality of users by an authority, wherein said activation allows the selective association of said second plurality of users with said first plurality of users." There is no corresponding structure. |

| "a process for facilitating enabling at least one interactive networking functionality for said at least one user among said first plurality of users, wherein said at least one user among said first plurality of users selectively receives indicia of at least one user among said second plurality of users" | Plain and ordinary meaning, except for the phrase "interactive networking functionality," which is addressed below. | Indefinite. Governed by Section 112(6). The function is "facilitating enabling at least one interactive networking functionality for said at least one user among said first plurality of users, wherein said at least one user among said second plurality of users selectively receives indicia of at least one user among said second plurality of users." There is no corresponding structure. |
|---|---|---|
| "a process for facilitating determining which user among said second plurality of users has the strongest connection with said session area based, at least in part, on time spent within said at least one first set of spatial boundaries, such that said second plurality of users are ranked one above the other according to status;" | Plain and ordinary meaning. Not governed by Section 112(6). Alternatively, if governed by Section 112(6), the function is "facilitating determining which user among said second plurality of users has the strongest connection with said session area." The corresponding structure and acts are depicted in Figures 1 and 2 and described in the detailed descriptions thereof. The disclosure describes at column 15, lines 49-59 that Server 100 compiles analytics of permanence in an area 190 or 185 or around a Location 180. These analytics of permanence, stored at least temporarily on memory 102 are used by Controller 101 to determine, at least in part, which users have the strongest connection with such areas or location. Additional relevant disclosure may be found at col. 6, lines 29-58 and col. 9, lines 35-39. | Indefinite. Governed by Section 112(6). The function is "facilitating determining which user among said second plurality of users has the strongest connection with said session area based, at least in part, on time spent within said at least one first set of spatial boundaries, such that said second plurality of users are ranked one above the other according to status." There is no corresponding structure. |

| "a process for facilitating activating a timer associated to said one user among said second plurality of users such that if a task is not accomplished by said one user among said second plurality of users within the expiration of said timer, an association with said at least one user among said first plurality of users is inhibited, at least temporarily, and thus the quality of interactions between said first plurality of users and said second plurality of users is regulated;" | Plain and ordinary meaning. | Indefinite. Governed by Section 112(6). The function is "facilitating activating a timer associated to said one user among said second plurality of users such that if a task is not accomplished by said one user among said second plurality of users within the expiration of said timer, an association with said at least one user among said first plurality of users is inhibited, at least temporarily, and thus the quality of interactions between said first plurality of users and said second plurality of users is regulated." There is no corresponding structure. |
| --- | --- | --- |
| "a process for providing indicia to facilitate an encounter between said at least one user among said first plurality of users and said at least one user among said second plurality of users." | Plain and ordinary meaning. | Indefinite. Governed by Section 112(6). The function is "providing indicia to facilitate an encounter between said at least one user among said first plurality of users and said at least one user among said second plurality of users" There is no corresponding structure. |

### 1.  Analysis

The disputed phrases appear in Claim 9 of the '476 Patent. The parties dispute whether the phrases are means-plus-function terms governed by 35 U.S.C. § 112, ¶ 6.[25]

The Court finds that Claim 9 is a computer-readable medium claim, also known as a Beauregard claim. "A Beauregard claim—named after *In re Beauregard*, 53 F.3d 1583 (Fed. Cir. 1995)—is a claim to a computer readable medium (*e.g.*, a disk, hard drive, or other data storage device) containing program instructions for a computer to perform a particular process."

---

[25] The parties' arguments for this disputed term can be found in Plaintiff's Opening Claim Construction Brief (Dkt. #50 at 29-30); Defendants' Responsive Claim Construction Brief (Dkt. #51 at 39-46); and Plaintiff's Reply Claim Construction Brief (Dkt. #54 at 28-30).

*CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011). The preamble of Claim 9 recites "[a] computer software system having a *set of instructions* stored in *at least one non-transitory computer-readable medium*. . . ." '476 Patent at Claim 9 (emphasis added). The Federal Circuit has instructed that *Beauregard* claims should be treated as method claims. *See Dig.-Vending Servs. Int'l, LLC v. Univ. of Phx., Inc.,* 672 F.3d 1270, 1275 n.1 (Fed. Cir. 2012) (Beauregard claims "should be treated as method claims to avoid 'exalt[ing] form over substance'") (quoting *CyberSource*, 654 F.3d at 1374).

Defendants contend that the claims are not Beauregard claims, and argue that the claims lack the well-known and precise structure. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011) ("A Beauregard claim … is a claim to a computer readable medium … containing program instructions for a computer to perform a particular process."). According to Defendants, the claim is directed to a "software system" and not a "computer-readable medium."

The Court disagrees with Defendants' argument, because the claim recites that the "software system" has a set of instructions stored in "a non-transitory computer-readable medium for [performing a process]" *Uniloc 2017 LLC v. HTC Am., Inc.*, No. C18-1732 RSM, 2020 U.S. Dist. LEXIS 198952, at *24 n.8 (W.D. Wash. Oct. 26, 2020) (construing Beauregard claims and observing that "numerous courts have concluded that claim terms such as 'computer-readable medium,' 'computer readable storage medium,' executable . . . code,' 'executable software' and 'computer software' connote sufficient structure"); *Uniloc 2017 LLC v. Google LLC,* No. 2:18-CV-00492-JRG-RSP, 2020 U.S. Dist. LEXIS 18699, at *46 (E.D. Tex. Feb. 5, 2020) (construing Beauregard claims and finding that the term "computer-readable medium" connotes sufficiently definite structure to avoid application of § 112, ¶ 6). Accordingly, the Court finds that the

computer-readable medium claim in the '476 Patent is not subject to § 112 ¶ 6.

Here, there is a rebuttable presumption that § 112 ¶ 6 does not apply because the claims do not recite the word "means." [26] Therefore, the analysis proceeds in two steps. Starting with the first step, Defendants argue that the claim term invokes means-plus-function treatment because it recites "a plurality of modules, each modules (sic) comprising: a process for …." Defendants also argue that "module" is the most well-recognized nonce word. According to Defendants, the term "process" is just as generic as "module" because it recites a function performed by the "process." Defendants also contend that the claim merely recites a set of functions performed by a nonstructural processes and modules, invoking § 112(6). Defendants further argue that there is no corresponding structure in the specification for the "processes" set out in the two "process for" terms of Claim 9.

The Court finds that Defendants have conflated the steps in the § 112 ¶ 6 analysis. *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298-1299 (Fed. Cir. 2014) ("Requiring traditional physical structure in software limitations lacking the term means would result in all of these limitations being construed as means-plus-function limitations and subsequently being found indefinite."); *Zeroclick, LLC v. Apple Inc.,* 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) (holding that the district court erred by effectively treating "program" and "user interface code" as nonce words and concluding in turn that the claims recited means-plus-function limitations.). The plain language of the claims indicate that disputed phrases describe the specific processes carried out by the "set of instructions" that are stored in the "non-transitory computer-readable medium." In other words, the claim language provides a description of how the computer-readable medium is specifically

---

[26] Section "i. Rebuttable Presumption" in Section D includes a discussion of relevant case law regarding the rebuttable presumption.

programmed to operate.

Thus, a person of ordinary skill in the art would understand that the claim language recites sufficient structure, and that the term "computer-readable medium" is not used as a generic term or black box recitations of structure or abstractions. *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007-09 (Fed. Cir. 2018) ("a person of ordinary skill in the art could reasonably discern *from the claim language* that the words '*program*,' . . . and '*user interface code*,' . . . are used not as generic terms or black box recitations of structure or abstractions, but rather as specific references to conventional graphical user interface programs or code, existing in prior art at the time of the inventions.") (emphasis added).

It is true that when a limitation is a means-plus-function limitation, and the corresponding structure is software, there must be an algorithm for the software or else the means-plus-function limitation will be considered indefinite unless the function can be performed by a general purpose computer. *See Function Media, LLC v. Google, Inc.*, 708 F.3d 1310, 1318 (Fed. Cir. 2013) (holding that the corresponding disclosure for a computer-implemented means-plus-function claim is an algorithm). But that authority is not on point because that definiteness analysis is triggered only where the limitation is a means-plus-function limitation.

In summary, although the presumption against § 112 ¶ 6 is no longer "strong," it is still a presumption that Defendants must affirmatively overcome. In the context of the intrinsic record for the '476 Patent, the Court finds that Defendants have not shown that the "computer-readable medium" claims should be subject to § 112 ¶ 6. Accordingly, the Court rejects Defendants' argument that the "computer-readable medium" claims should be governed by § 112 ¶ 6, and finding that no further construction is required.

## 2.  Court's Construction

For the reasons set forth above, the phrase **"process for facilitating fruition of functionalities associated with a session area via a location aware mobile application; wherein: a) said session area exhibits at least one first set of spatial boundaries; b) said session area is associated with at least one time related parameter defining at least one functionality connected with said session area;"** the phrase **"a process for facilitating association with said session area of at least one user among a first plurality of users based, at least in part, on determining said at least one user's location;"** the phrase **"a process for facilitating selectively enabling the activation of a second plurality of users by an authority, wherein said activation allows the selective association of said second plurality of users with said first plurality of users;"** the phrase **"a process for facilitating enabling at least one interactive networking functionality for said at least one user among said first plurality of users, wherein said at least one user among said first plurality of users selectively receives indicia of at least one user among said second plurality of users;"** the phrase **"a process for facilitating determining which user among said second plurality of users has the strongest connection with said session area based, at least in part, on time spent within said at least one first set of spatial boundaries, such that said second plurality of users are ranked one above the other according to status;"** the phrase **"process for facilitating activating a timer associated to said one user among said second plurality of users such that if a task is not accomplished by said one user among said second plurality of users within the expiration of said timer, an association with said at least one user among said first plurality of users is inhibited, at least temporarily, and thus the quality of interactions between said first plurality of users and said second plurality of users is regulated;"** and the phrase **"a process for providing indicia to facilitate an encounter between said at least one user among said**

**first plurality of users and said at least one user among said second plurality of users"** are not subject to § 112 ¶ 6, and will be given their plain and ordinary meaning.

## V.      CONCLUSION

The Court adopts the constructions above for the disputed terms of the Asserted Patents. Furthermore, the parties should ensure that all testimony that relates to the terms addressed in this Order is constrained by the Court's reasoning. However, in the presence of the jury the parties should not expressly or implicitly refer to each other's claim construction positions and should not expressly refer to any portion of this Order that is not an actual construction adopted by the Court. The references to the claim construction process should be limited to informing the jury of the constructions adopted by the Court.

**SIGNED this 11th day of March, 2022.**

AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE